# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :
                                      :

               v.                  :

                                        :

SILVIO MONTANO VERGARA (1)   :
    a.k.a. "Antonio"                :
    a.k.a. "Don Rafa"            :
    a.k.a. "Rafael"                :
    a.k.a. "Padrino"               :

                                        :

MARLON VALENCIA-PORTOCARRERO (2) :
    a.k.a. "La Ketty"            :
    a.k.a. "Richard"              :
    a.k.a. "Edwin Jairo Valencia-Bermudez":
    a.k.a. "Quemado"           :
    a.k.a. "El Viejo"              :

                                        :

DAVID ORLANDO ANDRADE RAMIREZ (3):
                                        :

RAUL ARTURO FERNANDEZ (4)    :
                                        :

ALEXANDER LEUDO NIEVES (5)   :
    a.k.a. "Alex Brando"        :
                                        :

HEINER JULIAN                   :
    ARBOLEDA SATIZABAL (6)   :
    a.k.a. "Omelet"                :
                                          :

EDWIN ARNULFO MORENO IBARRA (7):
    a.k.a. "Georgina"             :
                                        :

CARLOS ALBERTO GOMEZ REINA (8) :
    a.k.a. "Carlitos"             :
                                        :

JORGE JUAN PERLAZA RAYO (9)  :
    a.k.a. "Carnicero"           :
                                        :

RAMIRO ANTURI LARRAHONDO (10) :
    a.k.a. "Doctor"              :
    a.k.a. "Fiscal"               :

**GOVERNMENT'S MOTION FOR PRE-TRIAL DETENTION OF DEFENDANTS**

CASE NO.  CR-10-018 (SUPERSEDING)

HON. JOHN D. BATES

## GOVERNMENT'S MOTION FOR PRE-TRIAL DETENTION OF DEFENDANTS

The United States of America, by and through the undersigned attorney, and hereby moves to detain the above captioned defendants pending trial.  In support thereof, the government states the following:

### INTRODUCTION

The United States respectfully moves this court to order the pretrial detention of the defendants pursuant to 18 U.S.C. § 3142(e) and § 3142(f)(1)(major drug offense) & (2)(flight risk, obstruction).  As set forth herein, there is a statutory presumption in favor of detention because the defendants are charged with, inter alia, Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing and Intending that It Will be Illegally Imported into the United States and Conspiracy to Distribute Five Kilograms or More of Cocaine On-Board a Vessel Subject to the Jurisdiction of the United States, an offense which carries a maximum penalty of more than ten years imprisonment.  Moreover, the defendants pose an unacceptable flight risk if released from custody and would pose a danger to the community.

### FACTUAL BACKGROUND

The Indictment in this case arises from evidence obtained during a multi-jurisdictional investigation targeting a maritime drug trafficking organization (hereinafter "organization" or "DTO") led by SILVIO MONTANO and MARLON VALENCIA, which, between in or around at least 2007 until the Defendants' arrest in 2010, transported ton-quantity shipments of cocaine

2

from Colombia to Central America.  Employing maritime vessels, the MONTANO DTO

provisioned go-fast vessels with fuel and satellite phones and hired boat crews.  For the go-fast

vessels, they planned the routes through international waters to prearranged refueling points

northward off the coast of Panama.  Upon arrival near Puntarenas, Costa Rica, the crews off-

loaded the cocaine.  In addition, using a hired cargo vessel, they attempted to transport a large

cocaine load from Barranquilla, Colombia, to Honduras.

The Investigation

The immediate investigation that led to the instant indictment began with a series of

Colombian judicially authorized wire intercepts in 2008 on MARLON VALENCIA, a.k.a. La

Ketty, a.k.a Quemado, which in turn led to wire intercepts of SILVIO MONTANO.  From 2008

to 2010, the Colombian Department of Administrative Security (DAS), a Colombian law

enforcement agency, intercepted over 200,000 calls of VALENCIA, MONTANO, and their co-

conspirators.[1]

Through the judicially authorized intercepts, DEA and Colombian investigators

determined that SILVIO MONTANO's and MARLON VALENCIA's right hand man, known in

South American drug trafficking circles as a "secretary," was HEINER ARBOLEDA, a.k.a.

OMELET, who served as an intermediary between the drug capos and the go-fast vessel

coordinators.  MONTANO also relied upon CARLOS GOMEZ, a.k.a CARLITOS, a Colombian

national with business contacts in Costa Rica, as a key lieutenant, coordinator and information

---

[1]The DAS wire intercepts were recently delivered to the United States by MLAT.  In
addition, the United States was also recently informed that another Colombian law enforcement
agency, known as CTI, also intercepted VALENCIA as part of a separate investigation.  The
United States is requesting copies of those intercepts.

conduit during the operations.

ARBOLEDA, a..k.a. OMELET, served as an information conduit to both JORGE

PERLAZA, a.k.a. CARNICERO, and EDWIN MORENO, a.k.a. GEORGINA.  PERLAZA,

a.k.a. CARNICERO supervised the outfitting and provisioning of the go-fast vessels in

Buenaventura, Colombia, and EDWIN MORENO, a.k.a. GEORGINA, directed the go-fast crews

once they were underway in the Eastern Pacific and also provided directions to the key

lieutenants at the refueling points in Panama and the destination zone near Puntarenas, Costa

Rica.

Based on the wire intercepts, DEA and Colombian investigators became aware that

MONTANO's organization was launching a series of go-fast vessels in November 2008.  The

wire intercepts led to a series of four (4) cocaine seizures associated with MONTANO's

organization.  In the course of the seizures, the wire intercepts corroborated that the go-fast

vessels were associated with the MONTANO organization.  The four seizures, each of which

were Eastern Pacific seizures, included the following:

December 1, 2008:  During the early morning hours, the Costa Rican Coast Guard, alert

to the probable arrival of cocaine laden vessels, encountered and pursued a go-fast vessel off the

coast of Puntarenas, Costa Rica.  The crew beached and abandoned the cocaine laden vessel near

the mouth of the Jesus Maria River, and Costa Rican authorities recovered approximately 2,600

kilograms of cocaine from the abandoned go-fast vessel.

December 2, 2008:  During the waning hours of December 1, 2008, and into the early

hours of December 2, 2008, the U.S. Coast Guard law enforcement detachment on-board the

U.S.S. Samuel B. Roberts encountered a go-fast in international waters off the coast of Panama.

4

During the chase by the U.S. Navy helicopter, the go-fast crew jettisoned the cocaine bales into the water, approximately 2,100 kilograms of which were later recovered by the U.S. Coast Guard.  The go-fast ultimately escaped capture and returned to Panamanian territorial waters.

December 12, 2008:  On or about December 12, 2008, U.S. Coast Guard officers on-board the U.S.S. Underwood pursued a go-fast vessel in international waters off the coast of Colombia.   Although the go-fast vessel and crew escaped, U.S. Coast Guard officers recovered about 1,500 kilos of cocaine that the go-fast crew tossed overboard.

February 2, 2009:  Finally, on or about February 2, 2009, Panamanian law enforcement recovered an abandoned go-fast with about 3,000 kilos of cocaine.

Having lost almost nine metric tons of cocaine, the DTO sought an alternate route northward to avoid interdiction by U.S. and Costa Rican law enforcement.  In February 2009, MONTANO's organization attempted to hire an undercover DEA Agent and a cooperating source (referred to as CS-Arturo), both posing as maritime shipping representatives, to transport a large load of cocaine along an Atlantic route from Barranquilla, Colombia to Honduras. Another cooperating source (referred to as CS-Gordo), personally met with FERNANDEZ and ANDRADE to initiate the discussions, and then CS-Gordo introduced CS-Arturo to RAUL FERNANDEZ and DAVID ANDRADE.

In early March 2009, CS-Arturo met with ANDRADE and FERNANDEZ at ANDRADE's ranch near the Honduran border to negotiate the transportation of the cocaine load on-board the cargo vessel controlled by CS-Arturo and the DEA undercover agent.  CS-Arturo showed ANDRADE a photograph of the cargo vessel and discussed a proposed route for the drug movement.  During CS-Arturo's meeting at ANDRADE's ranch, ANDRADE called

MONTANO and handed the phone to CS-Arturo so MONTANO could be introduced telephonically to CS-Arturo. Shortly thereafter, upon learning from CS-Arturo and the DEA undercover that the cargo vessel was available for inspection, ANDRADE directed his associate, "Kenneth" to inspect the vessel. The inspection was conducted shortly thereafter while the vessel was in Honduran territorial waters.

Towards the end of March 2009, CS-Arturo personally met with ANDRADE, ALEXANDER LEUDO, and MONTANO in Panama. There, they again discussed the details of the drug transaction, and CS-Arturo explained the proposed route that the cargo vessel would take from Barranquilla, Colombia, to Central America. MONTANO approved the deal and designated LEUDO to coordinate the transaction.

MONTANO, ANDRADE and the DEA undercover officer engaged in lengthy telephonic negotiations over various details of the scheme.[2] During the negotiations, MONTANO convinced the DEA undercover to lower the amount that MONTANO would pay in advance of the shipment.[3] The MONTANO organization eventually paid over $1 million as an up-front transportation fee for the DEA Agent and CS-Arturo to transport the cocaine load on-board a

---

[2]See Draft Transcript, 3-27-09, at 10:26 hours at page 5, attached, where ANDRADE talks to the DEA undercover officer and then passes the phone to MONTANO. During the discussion between MONTANO and the undercover officer, MONTANO agrees that the DEA undercover officer will transport 2,000 kilograms (described in coded language as 2,000 square meters) for the MONTANO DTO. Later, the amount was increased to approximately 2,730 kilograms. Note: all transcripts referred to herein are drafts that have not been certified.

[3]See Draft Transcript, 3-29-09, at 1833 hours, at pages 4-5, attached, where the DEA undercover officer agreed to reduce his up-front transportation fee (previously agreed upon to be $1,000 per kilogram) from 50 percent to 40 percent for delivering the load from Barranquilla to Honduras.

cargo vessel.[4]  The money was delivered in Tegucigalpa, Honduras in mid-April 2009.  A few days later, CS-Arturo met with MONTANO, LEUDO, another investor, and an undercover Colombian officer at the Dann Carleton Hotel in Barranquilla, Colombia.  CS-Arturo explained the logistics of the smuggling venture, and MONTANO again indicated that LEUDO would coordinate the transaction.

On April 22, 2009, in a consensually recorded call, ANDRADE admitted to the DEA undercover that he (ANDRADE) knew that the drugs were coming to the United States.  During the call, the undercover officer offered the services of his trucking company to transport the drugs across the border from Mexico into the United States.[5]

On or about April 23, 2009, the MONTANO and VALENCIA DTO delivered approximately 2,730 kilograms of cocaine in Barranquilla, Colombia, to be transported to La

---

[4]MONTANO, LEUDO and ANDRADE personally met with the cooperating source, but MONTANO and ANDRADE only had telephonic contact with the DEA undercover agent.

[5]See Draft Transcript, 04-22-09, at 1710 hours, at pages 3-4, attached:

| | |
|---|---|
| U/C: | Regarding...You know, the girlfriends we are going to pickup. |
| Andrade: | Yes. |
| U/C: | So, eventually, they will arrive up here, right? |
| Andrade: | Sure enough. |
| U/C: | Because, I have....trucking company. |
| ... | ... |
| | |
| U/C: | I'm talking about in the area of...Arizona. |
| ... | .... |
| Andrade: | Past Vicente? |
| U/C: | Yes, up past Vicente.  You understand me? |
| Andrade: | Oh no.  Here, we only come as far as here... to my house. |
| U/C: | Right, but you can recommend me with your friends, right? |
| Andrade: | Oh, for sure.  Good enough.  Good enough. |

Ceiba, Honduras.  Wire intercepts indicate that VALENCIA was an investor in the load.

Colombian law enforcement seized the cocaine.

In early May 2009, after ANDRADE thought the cocaine laden vessel had arrived in

Honduras, ANDRADE engaged in a consensually recorded call with the DEA undercover

officer.[6]  During the call, ANDRADE indicated that he controlled the police in that area of

Honduras and his people would kill anyone (other than ANDRADE's associate, Ken) who

attempted to remove the cocaine from the vessel.[7]

In addition, in the course of the investigation, DEA and Colombian law enforcement

became aware that VALENCIA was making cash payments to a corrupt Colombian prosecutor,

Defendant RAMIRO ANTURI, in exchange for which ANTURI was providing sensitive

investigative information about the Government's investigation of  MONTANO and

VALENCIA's drug trafficking organization.  The payments were made through an intermediary,

identified in the defendants' extradition affidavit as CS-3.[8]  In addition, according to the CS, the

_____

[6]At this point in the scheme, the load was late to arrive in Honduras, and CS-Arturo, who
was supposed to have remained in LEUDO's custody as security for the load, had been separated
from LEUDO at the Bogota airport.  Accordingly, ANDRADE appeared anxious to acquire the
cocaine in Honduras.

[7]Andrade:      .....Whoever goes in there for that...I'll take them out with the law.  Tell
                them I have all the law there.....I have my people.  I have that surrounded.
                Whoever goes there to get that and it is not my boy Ken, is going down
                brother....We will kill them if possible, brother, but my things, no one will
                take them but us brother.

Draft Transcript, 5/5/09, 15:48 hours, at page 3.

[8]Several weeks after VALENCIA and ANTURI's arrest in February 2009, CS-3 was
fatally shot multiple times in the back outside a bar or pool hall in Cali, Colombia.  The murder
remains under investigation.

8

MONTANO and VALENCIA organization believed that their payments to ANTURI were securing protection for the organization from law enforcement interference.

The Charges:

On or about January 26, 2010, the Defendants were charged in a superseding indictment in the District of Columbia with conspiracy to distribute five kilograms or more of cocaine on board a vessel subject to United States jurisdiction (Count I) and conspiracy to distribute five kilograms or more of cocaine knowing and intending that it would be illegally imported into the United States (Count II) in violation of Title 46, United States Code, Sections 70503 & 70506, and Title 21, United States Code, Sections 959 & 963.  In addition, MONTANO and his go-fast coordinators, ARBOLEDA (aka OMELET), GOMEZ (CARLITOS), MORENO (GEORGINA), PERLAZA (CARNICERO) were charged with unlawfully distributing five kilograms or more of cocaine on board a vessel subject to United States jurisdiction for the December 1, 2008, seizure in Costa Rica (Count III); and unlawfully distributing five kilograms or more of cocaine knowing and intending that the cocaine would be illegally imported into the United States for the December 2, 2008, seizure in international waters off the Western Coast of Panama (Count IV) and for the December 12, 2008, seizure in international waters off the Coast of Colombia (Count V).

Finally, MONTANO, VALENCIA, ANDRADE, FERNANDEZ, and LEUDO were charged with possession with intent to distribute five kilograms or more of cocaine on board a vessel subject to United States jurisdiction for the attempted distribution on board the cargo vessel on or about April 23, 2009 (Count VI).  The indictment includes a forfeiture allegation.

Nine of the 10 defendants were arrested in Colombia on provisional arrest warrants from

the United States, and were housed at Combita Prison pending extradition.  The tenth defendant,

LEUDO, is a fugitive.

LEGAL ANALYSIS

**A.  <u>Statutory Presumption</u>**

The presumption of detention under 18 U.S.C. §3142(e) applies in this case.  Under 18

U.S.C. §3142(e)(3), there is a statutory rebuttable presumption that no condition or combination

of conditions will reasonably assure the appearance of the defendants and the safety of the

community if the judicial officer finds that there is probable cause to believe that the defendants

committed an offense for which a maximum term of imprisonment of ten years or more is

prescribed in the Controlled Substances Act.  An indictment charging a qualifying offense, as is

the case here, is sufficient to trigger this presumption.  <u>United States v. Smith</u>, 79 F.3d 1208,

1210 (D.C. Cir. 1996).  When the presumption is triggered, it operates "at a minimum to impose

a burden of production on the defendant to offer some credible evidence contrary to the statutory

presumption."  <u>United States v. Alatishe</u>, 768 F.2d 364, 371 (D.C. Cir. 1985).

In addition, several additional factors in the detention statute also support the

Government's request for pretrial detention, including the nature and circumstances of the

offense, the weight of the evidence, the history and characteristics of the defendants, the safety of

the community, and the risk of flight.  Accordingly, detention is appropriate for each of the

defendants in this case.

**B.  <u>Nature and Circumstances of Offense Charged</u>**

The offense charged in the instant case involves an international drug conspiracy

operating out of Colombia, Costa Rica and Honduras that distributed  multi-ton quantities of

10

cocaine.  This is a serious offense that warrants detention.  See U.S. v. Martinez, 594 F. Supp.2d

15, 16 (DDC 2009)(finding offense of conspiracy to distribute five kilograms of cocaine

knowing it would be illegally imported into the United States to be a "serious" crime and

ordering Colombian defendant detained pending trial).  Although MONTANO and VALENCIA

were the leaders of this maritime drug distribution operation, ARBOLEDA (OMELET),

PERLAZA (CARNICERO), MORENO (GEORGINA) and GOMEZ (CARLITOS) also played

important roles in coordinating the go-fast shipments from November 2008 through February

2009.  They distributed and caused the distribution of cocaine on-board drug laden go-fast

vessels that were either abandoned (such as the Costa Rica seizure on December 1, 2008), or

pursued by the U.S. Coast Guard in international waters (such as the December 2, 2008 seizure

off the Coast of Panama and the December 12, 2008 seizure off the Coast of Colombia).

In addition, ANDRADE and LEUDO coordinated the delivery of approximately 2.7 tons

of cocaine in Barranquilla in April 2009.  According to ANDRADE, FERNANDEZ operated a

series of cocaine labs for the organization in Colombia.  FERNANDEZ made the initial

introduction of a DEA cooperating source to the organization and was to receive a commission

on the successful delivery of the drug load for making the introduction.

Abusing his position of trust, ANTURI accepted cash bribes through an intermediary and

in exchange, passed on law enforcement sensitive information to VALENCIA and MONTANO

about the Government's criminal investigation of MONTANO and VALENCIA's maritime drug

trafficking organization.  MONTANO and VALENCIA believed that their bribes to ANTURI

were buying them protection from law enforcement.  See U.S. v. Martinez, 594 F. Supp.2d at 16

(DDC 2009)(ordering the detention pending trial of a Colombian military official who received

bribes to help cocaine manufacturers avoid detection from Colombian law enforcement).

## C.  Weight of the Evidence

The weight of the evidence is strong.  The Government intends to introduce at trial the testimony of a cooperating source (CS-Gordo) who personally met with FERNANDEZ to offer the drug transportation services of CS-Arturo.  The cooperating source and/or the undercover officer also engaged in consensually recorded conversations with FERNANDEZ.

In addition, the Government will offer the testimony of CS-Arturo, who personally met with and negotiated with MONTANO, ANDRADE, FERNANDEZ and LEUDO, for the transportation of approximately 2.7 tons of cocaine.  Further, the government will offer the testimony of a DEA undercover agent who conducted telephonic negotiations with MONTANO and members of his organization (including ANDRADE and LEUDO) for the distribution of ton quantities of cocaine.  Reflecting his role as an investor, VALENCIA was intercepted on judicially authorized intercepts discussing the load, in code, with MONTANO.[9]  When ANDRADE believed that the load had arrived in Honduras, ANDRADE was consensually recorded by the DEA undercover as ANDRADE threatened to kill anyone who interfered with the load.

In addition, the Government of Colombia has turned over to the United States at least 200,000 intercepted calls involving members of the MONTANO and VALENCIA maritime drug trafficking organization.  These calls clearly demonstrate MONTANO directing his lieutenants as they coordinated the go-fast shipments, and also show how the lieutenants such as ARBOLEDA (OMELET), GOMEZ (CARLITOS), PERLAZA (CARNICERO) and MORENO

---

[9]  Intercepts also reflect significant money laundering activity by VALENCIA.

(GEORGINA) reported up the chain of command after the shipments were interdicted by law enforcement in December 2008 and February 2009.  Equally important, the lieutenants also coordinated with fellow go-fast lieutenants in Panama and Costa Rica who appeared to be responsible for refueling and provisioning the go-fasts as they made their way toward Costa Rica.

The United States will introduce the testimony of Costa Rican law enforcement witnesses who seized the abandoned go-fast near Puntarenas, Costa Rica, on December 1, 2008, and produce photographs of the seizure and the processing of the evidence.  In addition, the United States also anticipates calling U.S. Coast Guard witnesses who interdicted the go-fast vessels in international waters and recovered tons of cocaine that the boat crews tossed overboard during the pursuit before they escaped to Panamanian or Colombian territorial waters.

Regarding the corrupt Colombian prosecutor, during a search incident to ANTURI's arrest in Colombia, the Colombian law enforcement agents recovered from ANTURI's computer "flash" drive the very same document, believed to be fabricated but containing accurate information, that ANTURI had sold to VALENCIA and MONTANO.  This document detailed the Government's investigation of MONTANO, VALENCIA and their co-conspirators' maritime drug trafficking organization.  In addition, bank records confirm cash deposits (bribes) to ANTURI's bank account as detailed by the confidential source.

The weight of the evidence in this case is extraordinarily strong.  This factor under the Bail Reform Act tips decidedly in favor of detention in the instant case for each of the defendants.

**D.  <u>History and Characteristics of the Defendants</u>**

Each of the Defendants in this case is a foreign national with no formal ties to the United States, let alone the District of Columbia.  With the exception of ANDRADE, who is Honduran, the remaining eight defendants are Colombian nationals.  The lack of formal ties to the United States and the Defendants' international ties weigh in favor of detention.  See U.S. v. Medina Coronado, 588 F. Supp.2d 3, 4 (DDC 2008)(finding pretrial detention to be appropriate for Colombian defendant facing international drug trafficking charges who had no ties to the United States).

Although not confirmed, VALENCIA may have a prior criminal record in Colombia. The Government is not aware of criminal records of the remaining defendants.

The Defendants were extradited from Colombia to the United States.  Lacking any ties to the community, they present a serious flight risk.

**E.  Safety of the Community**

The federal courts have recognized that drug traffickers, particularly those in positions of authority, are likely to continue engaging in drug related activities if released on bail and therefore, they constitute a danger to the community.  See United States v. Knight, 636 F. Supp. 1462, 1466-67 (S.D. Fla. 1986).  The Government submits that the members of this drug trafficking organization present a danger to the community, as they too would continue to distribute large quantities of cocaine if they were released on bail pending trial.

MONTANO

In addition, during the course of the investigation, DEA developed information regarding specific threats to the safety of the community.  When MONTANO was arrested, he told the Colombian law enforcement officer that the Colombian law enforcement officer was fortunate,

because if he (MONTANO) had had more time and a chance to react, he (MONTANO) would have retrieved his weapon (suggesting use of the weapon against the officer).  The Colombian officer reported that MONTANO was in possession of two firearms at the time of his arrest.[10]

VALENCIA

VALENCIA is a large scale Colombian drug trafficker and money launderer.  In August 2007, the Colombian National Police seized illegal weapons from one of VALENCIA's drivers at a roadside checkpoint in Cali, Colombia.  According to Colombian law enforcement, as reported to DEA, VALENCIA was intercepted on a call with the driver and they discussed attempts to bribe the Colombian police.[11]

Equally important, it cannot be ignored that an important Government cooperating source was brutally murdered just a few short weeks after VALENCIA and ANTURI were arrested.  The murder of the cooperating source remains under investigation.

ANDRADE

ANDRADE utilized body guards who possessed firearms.  In addition, after the 2.7 ton cocaine load failed to arrive in Honduras on schedule, ANDRADE told the undercover officer that he (ANDRADE) controlled the law (meaning he had bribed the police) in that particular region of Honduras.  When ANDRADE thought the cocaine laden vessel had arrived in Honduras, he threatened to kill anyone who attempted to remove the cocaine from the cargo

---

[10]Colombia reported that MONTANO had permits for the firearms.

[11]The United States has not yet translated these intercepts.  This information is based on information that DEA received from Colombian law enforcement.

vessel. [12]

**F.  Risk of Flight**

A determination of risk of flight must be supported only by a preponderance of the evidence.  United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996; U.S. v. Simpkins, 826 F.2d 94, 96 (DC Cir. 1987).  The Government submits that each of the defendants is a serious flight risk, and due to the seriousness of the crimes charged, there are no set of conditions which would reasonably ensure their appearance at trial.  The Defendants are all foreign nationals with no formal ties to the United States.  MONTANO and GOMEZ have contacts in Costa Rica and Colombia, and ANDRADE has contacts in Honduras and Colombia.  VALENCIA was believed to travel to other South American countries as well.

These facts suggest that if the defendants were to be released, they would abscond and it would be very difficult to locate them again.  Accordingly, they pose an unacceptable flight risk.

**WHEREFORE**, for the foregoing reasons, the Government submits that defendants should be detained pending trial.

---

[12]Given the propensity to violence and the fact that an informant was murdered, the Government may seek a keep separate order for MONTANO, VALENCIA, ANDRADE and ANTURI.

16

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the

motion of the United States to detain the defendants pending trial.

Respectfully submitted,

Art Wyatt
Chief, Narcotic and Dangerous Drug Section

By:               /s/
Stephen Sola
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W., 8th Floor
Washington, D.C.  20530
Tel.:    (202) 514-8020
Email: Stephen.Sola@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October, 2010, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of such filing (NEF) to the following individuals:

Todd Merer, Esq.
Attorney for MARLON VALENCIA
575 Lexington Avenue, 31st Floor
New York, NY 10022
(212) 683-2525 (phone)
(212) 213-9786 (fax)
Toddmerer@aol.com (Email)

_____/s/_____
Stephen Sola
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W., 8th Floor
Washington, D.C.  20530
Tel.:   (202) 514-8020
Email: Stephen.Sola@usdoj.gov

18