**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| SILVIO MONTANO VERGARA (1) | : | |
|     a.k.a. "Antonio" | : | |
|     a.k.a. "Don Rafa" | : | |
|     a.k.a. "Rafael" | : | |
|     a.k.a. "Padrino" | : | |
| | : | |
| MARLON VALENCIA-PORTOCARRERO (2) | : | **GOVERNMENT'S MOTION FOR** |
|     a.k.a. "La Ketty" | : | **CONTINUANCE AND TO** |
|     a.k.a. "Richard" | : | **EXCLUDE TIME UNDER THE** |
|     a.k.a. "Edwin Jairo Valencia-Bermudez" | : | **SPEEDY TRIAL ACT** |
|     a.k.a. "Quemado" | : | |
|     a.k.a. "El Viejo" | : | |
| | : | CASE NO.  CR-10-018 |
| DAVID ORLANDO ANDRADE RAMIREZ (3) | : | (SUPERSEDING) |
| | : | |
| RAUL ARTURO FERNANDEZ (4) | : | HON. JOHN D. BATES |
| | : | |
| ALEXANDER LEUDO NIEVES (5) | : | |
|     a.k.a. "Alex Brando" | : | |
| | : | |
| HEINER JULIAN | : | |
|     ARBOLEDA SATIZABAL (6) | : | |
|     a.k.a. "Omelet" | : | |
| | : | |
| EDWIN ARNULFO MORENO IBARRA (7) | : | |
|     a.k.a. "Georgina" | : | |
| | : | |
| CARLOS ALBERTO GOMEZ REINA (8) | : | |
|     a.k.a. "Carlitos" | : | |
| | : | |
| JORGE JUAN PERLAZA RAYO (9) | : | |
|     a.k.a. "Carnicero" | : | |
| | : | |
| RAMIRO ANTURI LARRAHONDO (10) | : | |
|     a.k.a. "Doctor" | : | |
|     a.k.a. "Fiscal" | : | |

**GOVERNMENT'S MOTION FOR CONTINUANCE
AND TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT**

INTRODUCTION

The United States respectfully submits this motion seeking to exclude time from the

calculation of the date by which the above-named defendants must be tried pursuant to the

provisions of the Speedy Trial Act, 18 U.S.C. § 3161.  As set forth herein, the Speedy Trial Act

specifically authorizes the Court to (1) grant a continuance of the trial date in the interests of

justice because of the complexity of the case, 18 U.S.C. § 3161(h)(7); (2) exclude any period of

delay, not to exceed one year, where the government has made an official request for foreign

evidence, 18 U.S.C. § 3161(h)(8); and (3) exclude a reasonable period of delay, when the

defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no

motion for severance has been granted, 18 U.S.C. § 3161(h)(6).  In support of the instant motion,

the government states the following:

**FACTUAL BACKGROUND**

The Indictment in this case arises from evidence obtained during a multi-jurisdictional

investigation targeting a maritime drug trafficking organization (hereinafter "organization" or

"DTO") led by SILVIO MONTANO and MARLON VALENCIA, which, between in or around

at least 2007 until the Defendants' arrest in 2010, transported ton-quantity shipments of cocaine

from Colombia to Central America.  Employing maritime vessels, the MONTANO DTO

provisioned go-fast vessels with fuel and satellite phones and hired boat crews.  For the go-fast

vessels, they planned the routes through international waters to prearranged refueling points

northward off the coast of Panama.  Upon arrival near Puntarenas, Costa Rica, the crews off-loaded the cocaine.  In addition, using a hired cargo vessel, they attempted to transport a large cocaine load from Barranquilla, Colombia, to Honduras.

The Investigation

The immediate investigation that led to the instant indictment began with a series of Colombian judicially authorized wire intercepts in 2008 on MARLON VALENCIA, a.k.a. La Ketty, a.k.a Quemado, which in turn led to wire intercepts of SILVIO MONTANO.  From 2008 to 2010, the Colombian Department of Administrative Security (DAS), a Colombian law enforcement agency, intercepted over 200,000 calls of VALENCIA, MONTANO, and their co-conspirators.[1]

Through the judicially authorized intercepts, DEA and Colombian investigators determined that SILVIO MONTANO's and MARLON VALENCIA's right hand man, known in South American drug trafficking circles as a "secretary," was HEINER ARBOLEDA, a.k.a. OMELET, who served as an intermediary between the drug capos and the go-fast vessel coordinators.  MONTANO also relied upon CARLOS GOMEZ, a.k.a CARLITOS, a Colombian national with business contacts in Costa Rica, as a key lieutenant, coordinator and information conduit during the operations.

ARBOLEDA, a..k.a. OMELET, served as an information conduit to both JORGE PERLAZA, a.k.a. CARNICERO, and EDWIN MORENO, a.k.a. GEORGINA.  PERLAZA,

---

[1]The DAS wire intercepts were recently delivered to the United States by MLAT.  In addition, the United States was also recently informed that another Colombian law enforcement agency, known as CTI, also intercepted VALENCIA as part of a separate investigation.  The United States is requesting copies of those intercepts.

a.k.a. CARNICERO supervised the outfitting and provisioning of the go-fast vessels in Buenaventura, Colombia, and EDWIN MORENO, a.k.a. GEORGINA, directed the go-fast crews once they were underway in the Eastern Pacific and also provided directions to the key lieutenants at the refueling points in Panama and the destination zone near Puntarenas, Costa Rica.

Based on the wire intercepts, DEA and Colombian investigators became aware that MONTANO's organization was launching a series of go-fast vessels in November 2008. The wire intercepts led to a series of four (4) cocaine seizures associated with MONTANO's organization. In the course of the seizures, the wire intercepts corroborated that the go-fast vessels were associated with the MONTANO organization. The four seizures, each of which were Eastern Pacific seizures, included the following:

December 1, 2008: During the early morning hours, the Costa Rican Coast Guard, alert to the probable arrival of cocaine laden vessels, encountered and pursued a go-fast vessel off the coast of Puntarenas, Costa Rica. The crew beached and abandoned the cocaine laden vessel near the mouth of the Jesus Maria River, and Costa Rican authorities recovered approximately 2,600 kilograms of cocaine from the abandoned go-fast vessel.

December 2, 2008: During the waning hours of December 1, 2008, and into the early hours of December 2, 2008, the U.S. Coast Guard law enforcement detachment on-board the U.S.S. Samuel B. Roberts encountered a go-fast in international waters off the coast of Panama. During the chase by the U.S. Navy helicopter, the go-fast crew jettisoned the cocaine bales into the water, approximately 2,100 kilograms of which were later recovered by the U.S. Coast Guard. The go-fast ultimately escaped capture and returned to Panamanian territorial waters.

December 12, 2008:   On or about December 12, 2008, U.S. Coast Guard officers on-board the U.S.S. Underwood pursued a go-fast vessel in international waters off the coast of Colombia.   Although the go-fast vessel and crew escaped, U.S. Coast Guard officers recovered about 1,500 kilos of cocaine that the go-fast crew tossed overboard.

February 2, 2009:   Finally, on or about February 2, 2009, Panamanian law enforcement recovered an abandoned go-fast with about 3,000 kilos of cocaine.

Having lost almost nine metric tons of cocaine, the DTO sought an alternate route northward to avoid interdiction by U.S. and Costa Rican law enforcement.  In February 2009, MONTANO's organization attempted to hire an undercover DEA Agent and a cooperating source (referred to as CS-Arturo), both posing as maritime shipping representatives, to transport a large load of cocaine along an Atlantic route from Barranquilla, Colombia to Honduras. Another cooperating source (referred to as CS-Gordo), personally met with FERNANDEZ and ANDRADE to initiate the discussions, and then CS-Gordo introduced CS-Arturo to RAUL FERNANDEZ and DAVID ANDRADE.

In early March 2009, CS-Arturo met with ANDRADE and FERNANDEZ at ANDRADE's ranch near the Honduran border to negotiate the transportation of the cocaine load on-board the cargo vessel controlled by CS-Arturo and the DEA undercover agent.  CS-Arturo showed ANDRADE a photograph of the cargo vessel and discussed a proposed route for the drug movement.  During CS-Arturo's meeting at ANDRADE's ranch, ANDRADE called MONTANO and handed the phone to CS-Arturo so MONTANO could be introduced telephonically to CS-Arturo.  Shortly thereafter, upon learning from CS-Arturo and the DEA undercover that the cargo vessel was available for inspection, ANDRADE directed his associate,

"Kenneth" to inspect the vessel. The inspection was conducted shortly thereafter while the vessel was in Honduran territorial waters.

Towards the end of March 2009, CS-Arturo personally met with ANDRADE, ALEXANDER LEUDO, and MONTANO in Panama. There, they again discussed the details of the drug transaction, and CS-Arturo explained the proposed route that the cargo vessel would take from Barranquilla, Colombia, to Central America. MONTANO approved the deal and designated LEUDO to coordinate the transaction.

MONTANO, ANDRADE and the DEA undercover officer engaged in lengthy telephonic negotiations over various details of the scheme. During the negotiations, MONTANO convinced the DEA undercover to lower the amount that MONTANO would pay in advance of the shipment. The MONTANO organization eventually paid over $1 million as an up-front transportation fee for the DEA Agent and CS-Arturo to transport the cocaine load on-board a cargo vessel.[2] The money was delivered in Tegucigalpa, Honduras in mid-April 2009. A few days later, CS-Arturo met with MONTANO, LEUDO, another investor, and an undercover Colombian officer at the Dann Carleton Hotel in Barranquilla, Colombia. CS-Arturo explained the logistics of the smuggling venture, and MONTANO again indicated that LEUDO would coordinate the transaction.

On April 22, 2009, in a consensually recorded call, ANDRADE admitted to the DEA undercover that he (ANDRADE) knew that the drugs were coming to the United States. During the call, the undercover officer offered the services of his trucking company to transport the

---

[2]MONTANO, LEUDO and ANDRADE personally met with the cooperating source, but MONTANO and ANDRADE only had telephonic contact with the DEA undercover agent.

drugs across the border from Mexico into the United States.

On or about April 23, 2009, the MONTANO and VALENCIA DTO delivered approximately 2,730 kilograms of cocaine in Barranquilla, Colombia, to be transported to La Ceiba, Honduras.  Wire intercepts indicate that VALENCIA was an investor in the load. Colombian law enforcement seized the cocaine.

In early May 2009, after ANDRADE thought the cocaine laden vessel had arrived in Honduras, ANDRADE engaged in a consensually recorded call with the DEA undercover officer.[3]  During the call, ANDRADE indicated that he controlled the police in that area of Honduras and his people would kill anyone (other than ANDRADE's associate, Ken) who attempted to remove the cocaine from the vessel.

In addition, in the course of the investigation, DEA and Colombian law enforcement became aware that VALENCIA was making cash payments to a corrupt Colombian prosecutor, Defendant RAMIRO ANTURI, in exchange for which ANTURI was providing sensitive investigative information about the Government's investigation of  MONTANO and VALENCIA's drug trafficking organization.  The payments were made through an intermediary, identified in the defendants' extradition affidavit as CS-3.[4]  In addition, according to the CS, the MONTANO and VALENCIA organization believed that their payments to ANTURI were

---

[3]At this point in the scheme, the load was late to arrive in Honduras, and CS-Arturo, who was supposed to have remained in LEUDO's custody as security for the load, had been separated from LEUDO at the Bogota airport.  Accordingly, ANDRADE appeared anxious to acquire the cocaine in Honduras.

[4]Several weeks after VALENCIA and ANTURI's arrest in February 2009, CS-3 was fatally shot multiple times in the back outside a bar or pool hall in Cali, Colombia.  The murder remains under investigation.

securing protection for the organization from law enforcement interference.

The Charges:

On or about January 26, 2010, the Defendants were charged in a superseding indictment in the District of Columbia with conspiracy to distribute five kilograms or more of cocaine on board a vessel subject to United States jurisdiction (Count I) and conspiracy to distribute five kilograms or more of cocaine knowing and intending that it would be illegally imported into the United States (Count II) in violation of Title 46, United States Code, Sections 70503 & 70506, and Title 21, United States Code, Sections 959 & 963.  In addition, MONTANO and his go-fast coordinators, ARBOLEDA (aka OMELET), GOMEZ (CARLITOS), MORENO (GEORGINA), PERLAZA (CARNICERO) were charged with unlawfully distributing five kilograms or more of cocaine on board a vessel subject to United States jurisdiction for the December 1, 2008, seizure in Costa Rica (Count III); and unlawfully distributing five kilograms or more of cocaine knowing and intending that the cocaine would be illegally imported into the United States for the December 2, 2008, seizure in international waters off the Western Coast of Panama (Count IV) and for the December 12, 2008, seizure in international waters off the Coast of Colombia (Count V).

Finally, MONTANO, VALENCIA, ANDRADE, FERNANDEZ, and LEUDO were charged with possession with intent to distribute five kilograms or more of cocaine on board a vessel subject to United States jurisdiction for the attempted distribution on board the cargo vessel on or about April 23, 2009 (Count VI).  The indictment includes a forfeiture allegation.

Nine of the 10 defendants were arrested in Colombia on provisional arrest warrants from the United States, and were housed at Combita Prison pending extradition.  On or about October

20, 2010, ANDRADE was extradited to the United States, and the remaining defendants are in various stages of the Colombian extradition process.  The tenth defendant, LEUDO, is a fugitive.

Mutual Legal Assistance Treaties (MLATs)

The United States has submitted requests for evidence pursuant to Mutual Legal Assistance Treaty from Colombia, Costa Rica and Panama.

Colombian Evidence

On or about March 4, 2010, the United States submitted an MLAT request to the Government of Colombia seeking, inter alia, all Colombian judicially authorized wire intercepts associated with the case, line sheets of the intercepts, the forensic analysis of the cocaine seized on or about April 23, 2009, and non-drug evidence such as photographs, videotapes, and police reports.  In or about August 2010, the Colombian Government provided to the United States two computer hard drives and approximately 2000 pages of reports, line sheets and other materials. The United States is currently reviewing those documents and intends to submit at least portions to a contractor to be summarized and translated.[5]

Costa Rica

In early April 2010, the United States submitted an MLAT to the Government of Costa Rica requesting, inter alia, official copies of investigative reports, photographs and chain of custody forms associated with the seizure of approximately 2,600 kilograms of cocaine near Puntarenas, Costa Rica, on December 1, 2008.  The Government of Costa Rica has not yet

---

[5]Portions of the material were previously obtained from DEA Bogota on an unofficial basis and were fully translated.  To avoid submitting materials multiple times for translation, the United States is scanning all of the MLAT return into a database, and then will determine which materials will be submitted for translation.

provided the requested information to the United States, although the government reasonably

believes that the materials exist based on conversations with Costa Rican officials.

In addition, the United States has subsequently learned that Costa Rica may have

additional evidence that is pertinent to the instant case.  Costa Rican law enforcement performed

surveillance of MONTANO, ANDRADE, GOMEZ (CARLITOS) and others during the course

of the investigation, and also engaged in judicially authorized wire intercepts as part of its

investigation.  The United States is currently drafting and intends to submit a supplemental

MLAT to the Government of Costa Rica requesting official copies of photographs, reports,

intercepted calls, line sheets, and other pertinent investigative material and official records.

Panama

On or about May 26, 2010, the United States submitted an MLAT to the Government of

Panama requesting, inter alia, certified copies of investigative records pertaining to the seizure

of the go-fast vessel in early February 2009, as well as a forensic analysis of the seized cocaine

and non-drug evidence.  The Government of Panama has not yet provided the requested

information to the United States, although the United States reasonably believes that the

materials exist.

LEGAL ANALYSIS

A.   The Trial Date Should Be Continued In The Interests Of Justice Because Of The
     Complexity Of The Case.

The Speedy Trial Act authorizes the Court to effectively toll the seventy day trial period

by granting a "continuance on the basis of [the Court's] findings that the ends of justice served

by taking such action outweigh the best interest of the public and the defendant in a speedy trial."

18 U.S.C. § 3161(h)(7)(A).  In determining whether to grant a continuance, the Court must

consider:

> [w]hether the case is so unusual or complex, due to the number of
> defendants, the nature of the prosecution, or the existence of novel
> questions of fact or law, that it is unreasonable to expect adequate
> preparation for pretrial proceedings or for the trial itself within the
> time limits [prescribed by the statute].

18 U.S.C. § 3161(h)(7)(B)(ii), (iv).

A continuance in this case would serve the interests of justice because of the complex

nature of the prosecution.  The case, which alleges an international maritime conspiracy

involving 10 named defendants (nine of whom are in custody), stems from an investigation that

has generated in excess of an estimated 200,000 judicially intercepted telephone conversations

obtained from a Colombian wiretap.  The line sheets and reports ("Informes") summarizing the

calls are voluminous.  Although over 100 selected intercepted calls have already been translated

and transcribed (in draft, not certified form), the United States is in the process of identifying

additional calls from the line sheets that need to be translated and transcribed.

In addition, there are 50-60 consensually recorded calls involving MONTANO,

ANDRADE, LEUDO and FERNANDEZ that were recorded by either the DEA undercover

agent or the cooperating source which pertain to the seizure in Barranquilla in April 2009.

Although most of these consensually recorded calls have already been  translated and

transcribed, the investigation also generated Colombian police reports, some of which still

require translation and transcription.

The case also involves significant cocaine seizures in Costa Rica and Panama, as well as

two U.S. Coast Guard seizures in international waters off the coast of Panama and Colombia.

Those seizures also generated numerous documents, records, and evidence.

Further, several seizures occurred within the United States where law enforcement recovered cartoon logos affixed to the cocaine that matched the "Tweety" and "Tweety and Sylvester" logos affixed to the cocaine recovered from several go-fast seizures at issue in the instant investigation.  The United States is in the process of gathering those investigative files pertaining to those domestic seizures.

In addition, this case involves the extraterritorial application of United States law.  Most of the investigation occurred outside the United States and was conducted by special agents of the Drug Enforcement Administration and their foreign counterparts, including the Department of Administrative Security (DAS) and the DIJIN (Colombian drug police).  Accordingly, many of the government's witnesses reside outside the United States and therefore must be notified and brought to this country to testify at trial.  This includes the Colombian witnesses who conducted the wire taps and those who served as undercover and surveillance officers for the investigation leading to the seizure in Barranquilla in April 2009, as well as the Costa Rican witnesses who participated in the seizure near Puntarenas, Costa Rica, on December 1, 2008.

Moreover, the United States also must coordinate with the U.S. Coast Guard to ensure the presence at trial of the active duty Coast Guard officers who participated in the December 2nd and December 12th seizures in international waters.

Finally, inasmuch as the case also involves the prosecution of members of an international drug smuggling operation, it may well present novel questions of fact or law. Accordingly, the government respectfully submits that the ends of justice would be served by granting a continuance of the trial date, and that the "ends of justice served by taking such action

outweigh the best interest of the public and the defendant in a speedy trial." United States v.

Ambrosio, 898 F. Supp. 177, 192 (S.D.N.Y. 1995) (ends of justice exclusion justified by

complexity of case, where indictment charged seventeen defendants with large-scale drug

conspiracy); United States v. Kamer, 781 F.2d 1380, 1389 (9th Cir. 1986) (concluding that an

"ends of justice" continuance for additional trial preparation was supported by a complex case

that had numerous overseas documents, most of which were in the Dutch language, and many

foreign witnesses); United States v. Brooks, 697 F.2d 517 (3d Cir. 1982) (affirming district

court's grant of continuance for a complex case that alleged a drug manufacturing and

distribution conspiracy involving nine people, with four counts of substantive drug offenses

involving various members of conspiracy, where not all defendants had secured counsel, and

where discovery had not been completed at time continuance was granted).

Findings of complexity and resulting exclusions of time have been based on the presence

of a large amount of evidence gathered by means of court-authorized wiretaps.  Production and

review of wiretap evidence often take a substantial amount of time, justifying the exclusion of

such time from the Speedy Trial Act calculation.  See United States v. Butz, 982 F.2d 1378,

1381 (9th Cir. 1993) (exclusion of time justified in part because evidence of charged drug

conspiracy was in form of "hundreds of hours" of conversations intercepted pursuant to Title III

wiretap); United States v. Ditommaso, 817 F.2d 201, 210 (2d Cir. 1987) (case involving

"hundreds of reels of [audio]tapes" found sufficiently complex to justify exclusion of time under

Speedy Trial Act).

B.      Time Under the Speedy Trial Act Should Also Be Excluded Based Upon the
        Government's Official Request for Foreign Evidence.

The Speedy Trial Act further states that a period of delay shall be excluded in computing

the time within which the trial must commence under the following circumstances:

> any period of delay, not to exceed one year, ordered by a district
> court upon an application of a party and a finding by a
> preponderance of the evidence that an official request, as defined
> in section 3292 of this title, has been made for evidence of any
> such offense and that it reasonably appears, or reasonably appeared
> at the time the request was made, that such evidence is, or was, in
> such foreign country.

18 U.S.C. § 3161(h)(8).  See also United States v. Serna, 630 F. Supp. 779 (S.D.N.Y. 1986)

(finding the government was entitled to continued exclusion of time not to exceed one year under

Speedy Trial Act while the government made a diligent and good faith effort to obtain evidence

gathered by the Spanish police); United States v. Strong, 608 F. Supp. 188 (E.D. Pa. 1985)

(concluding that a failure to grant an ends of justice delay would deny the government needed

evidence and time necessary for effective preparation in a complex case that sought evidence

from Hong Kong and Singapore).

In this case, the United States filed Mutual Legal Assistance Treaty (MLAT) requests to

the Governments of Colombia, Costa Rica and Panama requesting, inter alia, police reports,

photographs, wire taps, and forensic analysis of drug and non-drug evidence.  Although the

Government of Colombia already provided its initial return, the United States anticipates the

necessity of filing a supplemental MLAT for additional evidence that has not yet been provided.[6]

---

[6]For instance, the United States recently became aware that a separate Colombian
investigation in 2007 obtained judicially authorized wire intercepts of MARLON VALENCIA,
and the United States anticipates filing a supplemental MLAT to obtain those wire intercepts.

In addition, the Governments of Costa Rica and Panama have not yet provided the

evidence that the United States requested by MLAT.[7]   The United States further submits that it

reasonably appears that this evidence requested by the Government exists in Colombia, Costa

Rica and Panama.  Accordingly, the Government contends that, pursuant to 18 U.S.C. §

3161(h)(8), a continuance of the trial date is appropriate, and such time should be excluded from

the time within which the trial must commence under the Speedy Trial Act.  See Serna, 630 F.

Supp. 779 (S.D.N.Y. 1986); Strong, 608 F. Supp. 188 (E.D. Pa. 1985).

C.      The Time Until The Remaining Defendants Have Been Extradited To The United States
        And Joined For Trial Should Be Excluded Under The Speedy Trial Act.

In addition to the reasons stated above, the Government requests that the time until the

remaining defendants have been brought to the United States and joined for trial, be excluded

from the speedy trial clock.  The Act states that "[a] reasonable period of delay when the

defendant is joined for trial with a codefendant as to whom the time for trial has not run and no

motion for severance has been granted" shall be excluded in computing the time within which

the trial must commence.  18 U.S.C. § 3161(h)(6).  In United States v. Varella, 692 F.2d 1352,

1359 (11th Cir. 1982), the Eleventh Circuit Court of Appeals noted that this provision embodied

Congress' recognition that "the efficiency and economy of joint trials far outweighed the

desirability of granting a severance where the criterion was simply the passage of time."

Moreover, in United States v. Franklin, 148 F.3d 451 (5th Cir. 1998), the Court found that

excluding 134 days while police searched for a fugitive co-defendant was reasonable in order to

permit a joint trial of defendants in a drug conspiracy case.  The Court stated that "[t]he utility of

---

[7]The United States intends to submit a supplemental MLAT to Costa Rica seeking
additional surveillance photographs and non-drug evidence.

a joint trial is particularly compelling here, as the defendants were charged with a single

conspiracy so that the government could be expected to recite a single factual history, put on a

single array of evidence, and call a single group of witnesses."  148 F.3d at 457 (internal

quotations omitted).  Similarly, in United States v. Tobin, 840 F.2d 867 (11ᵗʰ Cir. 1988), the

Eleventh Circuit found that the exclusion of eight months and ten days based upon an

unsuccessful effort to capture a fugitive co-defendant was reasonable. The court reasoned that

under the "totality of the circumstances," the delay was necessary to determine if the goal of a

single trial could be met and that the defendant was not prejudiced, "particularly in terms of

impairing his ability to defend himself."  840 F.2d at 869-70.

The interests stated above clearly support the exclusion of time under the Speedy Trial

Act in this case, until such time that all defendants have been extradited to the United States and

joined for trial.  Indeed, here, unlike the cases discussed above, the remaining defendants

charged in the Indictment, with the exception of ALEXANDER LEUDO, are not fugitives but,

rather, have already been arrested and are in the custody of the Colombian government awaiting

extradition.  Thus, unlike the above cases, there is a greater certainty regarding whether and

when these defendants will be brought to the United States to face trial.  In addition, the

defendants in this case are charged in a single conspiracy, and the government is expected to put

on a single array of evidence and call a single group of witnesses to testify about the conspiracy.

Thus, the interests of judicial economy strongly weigh in favor of a single trial in this case.

On the other hand, the burden of multiple trials here would be enormous given the

substantial costs and time-consumption that would undoubtedly result from having to bring

numerous law enforcement witnesses from Colombia, Costa Rica, and from various parts of the

United States to the District of Columbia for even a single trial.  In addition, the interest of witness safety could be severely compromised if the confidential sources who assisted in the investigation are called upon to testify and are forced to do so at multiple trials.

Accordingly, the government requests that this Court continue this case and toll the running of the Speedy Trial Act until such time as all defendants are extradited from Colombia and are joined for trial, pursuant to 18 U.S.C. § 3161(h)(6).[8]

At this early stage of the trial proceedings, it is impossible to gauge how long it will take the Government to obtain relevant evidence and the parties to effectively prepare for trial.  The Government, therefore, requests that the government's motion be granted and that periodic status hearings be set in no less than forty-five day intervals to determine an appropriate trial date.

WHEREFORE, for the all the foregoing reasons, the government respectfully requests that this Court grant the instant motion and (1) grant a continuance of the trial date in the interests of justice because of the complexity of the case, 18 U.S.C. § 3161(h)(7)(A); (2) exclude any period of delay, not to exceed one year, where the Government has made an official request for foreign evidence, 18 U.S.C. § 3161(h)(8); and (3) exclude a reasonable period of delay, when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted, 18 U.S.C. § 3161(h)(6).

---

[8]At present, LEUDO remains a fugitive and it is unknown whether he will be taken into custody.  At a minimum, the United States asks that the Court toll the Speedy Trial Act until the nine defendants in custody in Colombia are brought to the United States.  Once all defendants are in the United States, the Government will assess whether it is likely that LEUDO will be arrested and extradited to the United States to stand trial.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court grant the

motion of the United States to continue the trial date and to exclude any period of delay under

the Speedy Trial Act while the Government seeks foreign evidence and while the Government

awaits the extradition of the remaining defendants who are in custody in Colombia.

Respectfully submitted,

Art Wyatt
Chief, Narcotic and Dangerous Drug Section

By:                   _____/s/_____
Stephen Sola
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W., 8th Floor
Washington, D.C.  20530
Tel.:    (202) 514-8020
Email:  Stephen.Sola@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 24st day of October 2010, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of such filing (NEF) to the following individuals:

Todd Merer, Esq.
Attorney for MARLON VALENCIA
575 Lexington Avenue, 31st Floor
New York, NY 10022
(212) 683-2525 (phone)
(212) 213-9786 (fax)
Toddmerer@aol.com (Email)

Steven J. Golembe, Esq
Attorney for SILVIO MONTANO
2340 South Dixie Highway
Miami, FL33133
(305) 858-0404 (phone)
(305) 858-3100 (fax)
GolembeS@GolembeLaw.com

David Nestor, Esq.
Attorney for SILVIO MONTANO
717 D Street, N.W., Suite 310
Washington, DC 20004
(202) 783-4474 (phone)
(202) 461-8188 (fax)
NestorK@aol.com

Rosanna M. Taormina, Esq.
Office of the Federal Public Defender
Attorney for DAVID ANDRADE
625 Indiana Ave, N.W., Suite 550
Washington, DC 20004
Rosanna_M_Taormina@FD.Org

            /s/ _____
            Stephen Sola
            Trial Attorney
            Narcotic and Dangerous Drug Section
            Criminal Division
            U.S. Department of Justice

1400 New York Avenue, N.W., 8th Floor
Washington, D.C.  20530
Tel.:    (202) 514-8020
Email:  Stephen.Sola@usdoj.gov