**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal No.  10-18-10 (JDB)** |
| **RAMIRO ANTURI LARRAHONDO,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION & ORDER**</u>

At the time of his arrest on February 9, 2010, defendant Ramiro Anturi Larrahondo was a prosecutor in the nation of Colombia.  Anturi's co-defendants are alleged to have been part of a maritime drug trafficking organization ("DTO") that transported tons of cocaine intended for the United States from Colombia to Central America.  The DTO allegedly made cash payments to Anturi in exchange for sensitive information about the investigation of the DTO and to protect the DTO from law enforcement.  Anturi has been indicted on one count of conspiracy to distribute five kilograms or more of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503 and 70506 and 18 U.S.C. § 2, and one count of conspiracy to distribute five kilograms or more of cocaine knowing and intending that the cocaine will be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959, 960 and 963 and 18 U.S.C. § 2.

1

Most co-defendnats have pled guilty and others are engaged in plea discussions. Anturi's trial is scheduled to begin on October 15, 2012.  Now before the Court are ten motions by the defendant and one notice and motion by the government.  Anturi's motions pertain largely to evidentiary matters, as well as a few other issues.  The government's notice and motion regards the introduction of evidence pursuant to Federal Rule of Evidence 404(b).  A motions hearing was held on June 29, 2012.

For the reasons described below, the Court will essentially deny each of the defendant's ten motions, although the discussion herein may have certain implications for the government's pre-trial obligations as well as the presentation of evidence at trial.  The Court will also grant the government's motion, finding that the evidence sought to be introduced is admissible under Rule 404(b), although it is not intrinsic to the charged crime.

I. Background

As explained in this Court's Order of September 29, 2011, denying Anturi's motion for a bill of particulars, the government has summarized seven pieces of evidence pertaining to its case against Anturi.  See Order of Sept. 29, 2011 [Docket Entry 98] at 3.  By the government's characterization, this evidence includes intercepted calls between Anturi and his co-conspirators, as well as two other individuals; recordings of conversations between Anturi and a confidential source; a bank receipt reflecting a bribe from the DTO to Anturi; a purported government document, provided by Anturi to the DTO, that contained information regarding the DTO's trafficking activities; documents retrieved from Anturi's computer drive about the DTO; and a transcript of an interview with Anturi conducted by a federal agent.  Id.  The government has alleged that the defendant provided sensitive information regarding the DTO and committed

2

other acts in order to make it possible for the co-conspirators to continue drug trafficking without detection.  Id.  The government contends that these actions amount to aiding and abetting an ongoing conspiracy, making Anturi liable as a principal.  Id. at 3-4.

II.  Discussion

Anturi has filed ten motions.  In the order that the motions were filed, he moves (1) for a pre-trial determination on the admissibility of alleged co-conspirator statements, (2) to exclude evidence of events predating his membership in the charged conspiracies, (3) for immediate production of transcripts, (4) for production of the confidential informant file of Jorge Baena, (5) to strike improper aliases, (6) to suppress post-arrest statements made to the Drug Enforcement Agency, (7) to suppress wiretap evidence, (8) to unseal the co-defendants' plea agreements and court proceedings, (9) to dismiss count one of the superseding indictment, and (10) to compel production of discovery.  The government has filed a notice and motion regarding the introduction of evidence pursuant to Federal Rule of Evidence 404(b).  The Court will address the defendant's motions in the order that each was filed and then address the government's notice and motion.

a.  Anturi's motions for a pre-trial determination on the admissibility of alleged co-conspirator statements and to exclude events predating his membership in the charged conspiracies

Anturi has filed two related motions regarding the connection between evidence of drug trafficking that does not directly involve him and evidence involving him that does not directly involve drug trafficking.  The first motion indicates that the government has provided to the defense audio recordings of approximately 140 phone calls, of which approximately 45 directly involve the defendant.  Def.'s Mot. for a Pre-Trial Determination on the Admissibility of Alleged Co-Conspirator's Statements [Docket Entry 148] ("Def.'s Pre-Trial Deter. Mot.") at 1.  Anturi

notes that under Federal Rule of Evidence 801(d)(2)(E), a statement is not considered hearsay if it is offered against a defendant and "was made by the [defendant's] coconspirator during and in furtherance of the conspiracy."  Def.'s Pre-Trial Deter. Mot. at 3-4.  He relies on Bourjaily v. United States, 483 U.S. 171 (1987), for the proposition that, in order for such a statement to be admissible, the district court must find by a preponderance of evidence that a conspiracy existed, that the defendant and declarant were members of the conspiracy, and that the statement was made in furtherance of that conspiracy.  Anturi argues that the government does not have sufficient evidence to connect him with the narcotics conspiracy because the phone calls directly involving him began almost seven months after the last seizure of cocaine, are with two persons who have never been identified as co-conspirators in the case, and appear to be unrelated to drug trafficking.  Def.'s Pre-Trial Deter. Mot. at 4-5.

Anturi's second motion also contends that the government has insufficient evidence to connect Anturi to the drug trafficking conspiracy.  Def.'s Mot. to Exclude Evidence of Events Predating His Membership in the Charged Conspiracies [Docket Entry 149] ("Def.'s Mot. to Exclude Predating Evidence") at 1, 2.  Anturi relies on United States v. Hitt, 107 F. Supp. 2d 29 (D.D.C. 2000), which in turn relies on Grunewald v. United States, 353 U.S. 391 (1957), for the proposition that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment."  Grunewald, 353 U.S. at 401-02.  Anturi indicates that, to his knowledge, the evidence involving drug trafficking occurred from December 2008 to April 2009, that he was not involved in the conspiracy during this time period,

4

and that, in his view, the conspiracy terminated before he is alleged to have joined.  Def.'s Mot.

to Exclude Predating Evidence at 2-3.

The second motion also makes an argument about the effect of the Supreme Court's

decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), on the determination to be made by

the jury in this case.  The defendant notes the broad scope of "Pinkerton liability" — "the well-

settled principle of conspiracy law that someone who jointly undertakes a criminal activity with

others is accountable for their reasonably foreseeable conduct in furtherance of the joint

undertaking."  United States v. Saro, 24 F.3d 283, 288 (D.C. Cir. 1994) (citing Pinkerton v.

United States, 328 U.S. 640 (1946)).  He also notes the black letter rule that "with regard to

liability for conspiracy, a defendant may be legally responsible for acts of coconspirators prior to

that defendant's entry into the conspiracy."  United States v. Blackmon, 839 F.2d 900, 908-09

(2d Cir. 1988).  Anturi nonetheless argues that "the rules of drug attribution do not hold a co-

conspirator responsible for drug trafficking which took place before he joined the conspiracy."

Def.'s Mot. to Exclude Predating Evidence at 4.  Anturi relies on United States v. Rodriguez-

Gonzalez, 433 F.3d 165, 168 (1st Cir. 2005), which, after noting that "[e]vents in a conspiracy

prior to a defendant's joinder may be relevant," including for "characterization of the conspiracy

or Pinkerton liability," concluded that "when it comes to sentencing, the guidelines say that a

defendant is responsible only for losses that occurred and victims who were injured after he

joined."  Anturi argues that it would be unfairly prejudicial under Federal Rule of Evidence 403

for the government to admit evidence of drug trafficking that is not attributable to him.

The Court will first address the defendant's argument about the relationship between

Apprendi and Pinkerton liability, out of concern that Anturi has incorrectly perceived the nature

of the charges against him.  Put simply, the defendant's second motion misstates the law.

Apprendi held that "convictions depend on findings by a jury (unless waived) of the elements of

an offense."   United States v. Fields, 325 F.3d 286, 289 (D.C. Cir. 2003) (citing Apprendi, 530

U.S. at 476-77).  The D.C. Circuit has applied this rule to drug quantity, where drug quantity is

an element of the offense:  "Where the drug quantity alters the substantive offense, as it can

under 21 U.S.C. §§ 841 and 846, Apprendi applies."  Fields, 325 F.3d 286 at 289 (citing United

States v. Webb, 255 F.3d 890, 896 (D.C. Cir. 2001)).  In this Court's view, all that these

statements mean is that a jury applying the reasonable doubt standard, rather than a judge, must

make the finding on the drug quantity alleged in the indictment — in this case, that the

conspiracies were to distribute more than five kilograms of cocaine.  Furthermore, per

Rodriguez-Gonzalez, the judge, in applying the sentencing guidelines, may not consider events

prior to the defendant's joining the conspiracy.  But these cases have nothing to do with the

underlying determination made by the jury about whether the defendant is guilty of the charged

offense.  Under Pinkerton, the jury may hold the defendant criminally liable for conspiracy to

commit acts — including drug trafficking — that predate his joinder in the conspiracy.  In other

words, so long as the jury makes the determination applying the right legal standard, the

defendant may properly be found guilty of conspiracy to traffic a quantity of drugs that includes

drugs trafficked before his entrance into the conspiracy.  The Apprendi line of cases does nothing

to change this principle, which has been the law for more than fifty years.

    With this understanding in mind, Anturi's argument under Rule 403 largely falls away.

The government can introduce evidence at trial about drug trafficking predating defendant's

joinder in the conspiracy because that evidence may be relevant to proving that the defendant

was a member of a conspiracy to traffic more than five kilograms of cocaine.  The Court is sensitive to the concern that the sheer volume of evidence about the DTO could, at some point, prove prejudicial to the defendant, who is not alleged to have been involved directly with the physical distribution of the narcotics in question.  A determination may need to be made at trial to limit the quantity of evidence, if it becomes clear that the government has more than sufficiently proved that the DTO was trafficking large quantities of cocaine.

With respect to Anturi's arguments regarding his involvement in the conspiracy, the Court agrees that it must, under Federal Rules of Evidence 801(d)(2)(E) and 104(a), make a determination regarding the admission of coconspirator statements that would otherwise be hearsay.  The Court must determine, by a preponderance of the evidence standard, that a conspiracy existed, that the statement was in furtherance of the conspiracy, and that the defendant was a "member" of the conspiracy.  Bourjaily, 483 U.S. at 175-76.  Here, Anturi disputes that he was a member of the conspiracy and, relatedly, that the conspiracy existed at the time of his involvement in the events.  He also contends that his involvement was not unlawful. It would be difficult to dispute that a conspiracy to traffic drugs existed at some time, and the defendant has also not disputed that specific statements by others regarding drug trafficking were made in furtherance of that underlying conspiracy.

The Court does not agree, however, that it is appropriate for this determination to be made before trial.  At the motions hearing, the government proffered that its case will include evidence that the underlying conspiracy to traffic drugs continued into early 2010, well beyond the last seizure of narcotics in April 2009 and temporally overlapping with the recorded calls directly involving the defendant.  The government also proffered that its case will include

evidence that the defendant counseled the DTO on law enforcement's activities, including the possibility of extradition to the United States, as early as May 2009.  Standard practice in this district is to allow the government to admit coconspirator statements conditionally, subject to connection by the government at trial.  See United States v. Jones, 451 F. Supp. 2d 71, 84 (D.D.C. 2006), rev'd on other grounds, 615 F.3d 544 (D.C. Cir. 2010), aff'd, 132 S. Ct. 945 (2012); United States v. Edelin, 128 F. Supp. 2d 23, 45-46 (D.D.C. 2001); see also United States v. Jackson, 627 F.2d 1198, 1218 (D.C. Cir. 1980); United States v. Gantt, 617 F.2d 831, 845 (D.C. Cir. 1980).  In light of the government's proffer, the Court does not see any reason to deviate from this practice.

With respect to the Grunewald issue (that the conspiracy temporally terminated before the defendant's joinder), the government has proffered sufficient evidence that the conspiracy did not end prior to Anturi's alleged involvement in this matter.  The Court does not believe that it is appropriate to have a "mini-trial" before the actual trial, in which the government is forced to lay out in more detail its evidence that the conspiracy continued.  Furthermore, although the Court understands Anturi's contention that his involvement with the DTO was too minimal or benign to constitute "belonging" to the conspiracy, the Court does not believe this determination should be made before trial.  On their face, the facts alleged by the government — that Anturi protected an ongoing conspiracy to traffic drugs from apprehension by law enforcement — certainly could constitute membership in a drug trafficking conspiracy, even if, in a vacuum, defendant's conduct would not be obviously in violation of the laws of the United States.  It is often the case that certain conduct might be perfectly lawful in one context but illegal under a different set of circumstances.  Whether the evidence bears out this contention at trial is a different matter,

which may be an appropriate subject for the Court to consider when possessed of all the facts. But, especially considering that a grand jury has returned an indictment on the charges in question, the Court is not willing to put the government to a pre-trial hearing, posed as an evidentiary issue, on whether Anturi's conduct constituted aiding and abetting a conspiracy.

To be sure, the Court appreciates that Anturi would like this issue to be decided sooner, rather than later, because if the Court determines, for whatever reason, that the evidence of drug trafficking (including coconspirator calls) is not admissible, the charges against Anturi are likely to be dropped or dismissed.  But this fact also undermines the prejudice the defendant will suffer from admitting this evidence subject to connection at trial, since it is unlikely that this case will proceed to verdict if the evidence is actually excluded.  In any case, while the Court is sympathetic to Anturi's desire to have the charges against him resolved quickly, the Court believes that what is most appropriate here is to move forward with resolution of this matter at trial.  Hence, the Court will deny these two motions.

b.  Anturi's motion for immediate production of transcripts

As indicated above, the government has provided to the defense audio recordings of 140 conversations that constitute possible evidence to be admitted at trial.  Def.'s Mot. for Immediate Production of Transcripts [Docket Entry 150] at 1.  Anturi indicates that he has received transcripts and translations of fourteen of the calls, and he seeks an order for the government to immediately turn over any other transcripts it has already produced, for a deadline for production of final transcripts, and for the government to identify immediately which calls it intends to use at trial.  Id. at 3-4; Def.'s Reply in Supp. of Mot. to Compel Production of Transcripts [Docket Entry 201] at 2-3.  The defendant relies on Federal Rule of Criminal Procedure 16(a)(1)(E),

which provides in relevant part that "the government must permit the defendant to inspect and to copy" a document "if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial."  More specifically, the defendant cites United States v. Archbold-Manner, 581 F. Supp. 2d 22, 24 (D.D.C. 2008), for the proposition that the government must produce transcripts before trial in an international narcotics prosecution.  The government indicated at the status conference on August 14, 2012, that it had turned over 63 transcripts and intends to turn over an estimated additional 59 transcripts in the following two to three days.

The Court will deny the motion because it is satisfied with the government's proposed timeline for turning over the materials. The parties should confer and bring to the Court any remaining issues involving transcripts and translations by not later than 30 days before trial commences.  The Court also encourages the government to identify more specifically which of the approximately 122 transcripts it intends to use at trial.

c.  Anturi's motion for production of the confidential informant file of Jorge Baena

Anturi seeks access to files from the DEA and Colombian National Police (CNP) for Jorge Baena, a deceased confidential informant.  Baena is identified as a "confidential source" in transcripts of recorded conversations that the government has provided to the defense.  Def.'s Mot. for Production of the Confidential Informant File of Jorge Baena [Docket Entry 151] ("Def.'s Baena Mot.") at 1-3, 5.  Anturi maintains that any information concerning Baena's status as an informant must be disclosed under Brady v. Maryland, 373 U.S. 83, 87 (1963), as "evidence favorable to the accused."   He further contends that the government should be required to procure Baena's CNP file from the Colombian government and produce that file to

the defense as part of its <u>Brady</u> obligations.  Def.'s Baena Mot. at 1, 7.  Anturi believes that

Baena had motive to falsely implicate him and that at a minimum the Court should conduct an <u>in</u>

<u>camera</u> review of Baena's file and order disclosure of the portions that are relevant to this theory

of the defense.  Def.'s Reply in Supp. of Mot. to Compel Production of Cooperator File [Docket

Entry 203] at 1.  The defendant relies on Federal Rule of Criminal Procedure 16 — which, as

stated above, requires the government to turn over documents "material to preparing the defense"

— and Federal Rule of Evidence 806, which provides that when a hearsay statement (or a

statement that would otherwise be hearsay if not for the definitional exceptions to the hearsay

rule) has been admitted, "the declarant's credibility may be attacked, and then supported, by any

evidence that would be admissible for those purposes if the declarant had testified as a witness."

    In response to Anturi's motion, the government summarizes what it characterizes as a

"split" among the circuits on "the issue of what impeachment discovery must be provided to the

defendant where the witness does not testify."  Gov.'s Resp. to Def.'s Mot. for Production of

Confidential Informant File [Docket Entry 182] ("Gov.'s Baena Resp.") at 2-3.  The government

contends that the requirement to turn over relevant impeachment information for testifying

witnesses, as set out in <u>Giglio v. United States</u>, 405 U.S. 150 (1972), has been held to apply to

out-of-court declarants (i.e., those whose statements are introduced at trial but do not themselves

testify) in <u>United States v. Jackson</u>, 345 F.3d 59 (2d Cir. 2003), but has been held not to apply in

<u>United States v. Green</u>, 178 F.3d 1099, 1109 (10th Cir. 1999), and <u>United States v. Mullins</u>, 22

F.3d 1365 (6th Cir. 1994).  The government maintains that the D.C. Circuit in <u>United States v.</u>

<u>Williams-Davis</u>, 90 F.3d 490 (D.C. Cir. 1996), "stopped short of saying that any and all

impeachment materials needed to be turned over, as the defendant is requesting in his motion." Gov's Baena Resp. at 3.

The Court will deny Anturi's motion, but will make clear how it understands the government's Brady obligations with respect to Baena.  Having reviewed the cases cited by the government, the Court is not convinced that a "circuit split," per se, exists concerning the requirement to turn over material about non-testifying declarants whose statements are introduced at trial.  The Court agrees with the Second Circuit that although Green and Mullins "could be read to hold that Giglio, unlike Brady, applies only to government witnesses who testify," a "blanket distinction between Brady and Giglio claims on the basis of whether the witness testifies" is not warranted.  Jackson, 345 F.3d at 71 n.6 (emphasis added).  The same Brady rule must be applied to the two situations, depending on whether the person will be testifying (the Giglio situation) or whether instead, as here, the out-of-court statements will be admitted without the person testifying.  Each of the cited cases — Green, Mullins, and Williams-Davis, as well as the Second Circuit's decision in Jackson (despite the statement about Giglio) — simply applied Brady in a logical way to information that could be used to impeach the probity of the admitted out-of-court statements.  As the D.C. Circuit stated, under Brady the government "has an affirmative duty to disclose material evidence 'favorable to an accused,'"  and so, for example, "[i]f a declarant contradicted himself on a key point, then Brady would likely require disclosure."  Williams-Davis, 90 F.3d at 513-14 (quoting Brady, 373 U.S. at 87).  Hence, under Brady, the government has an obligation to turn over material information that would undermine the evidence it intends to admit at trial — including information that could indicate that a declarant's admitted statements were made with reason to be untruthful or misleading.  If the

government has information that indicates, as Anturi suggests, that Baena had a motive to implicate Anturi in a crime, that sort of information would seem to qualify as Brady material if the government will introduce inculpatory statements from Baena at trial.  But, to the degree that Giglio may require broader disclosure of impeachment information for testifying witnesses — including information undermining witness credibility that is not directly relevant to the admitted statements, such as information about unrelated prior criminal convictions — then the Court agrees that disclosure of this broader category of information may not be required for out-of-court declarants, since they are not actually testifying at trial.

The Court is not persuaded by the defendant's contention that he is entitled either to the entirety of Baena's file or to have the Court conduct an in camera review of the file for Brady material.  The precedent is clear that the prosecutor "ha[s] the responsibility under the Brady framework to make the first determination about whether material [is] exculpatory."  Williams-Davis, 90 F.3d at 514.  Anturi has cited no authority that contradicts this clearly stated rule.  Federal Rule of Criminal Procedure 16(a) requires the government to turn over items material to preparing the defense.  And Federal Rule of Evidence 806 indicates what evidence is admissible at trial; it says nothing about the government's disclosure obligations.

d.  Anturi's motion to strike improper aliases

Anturi moves to strike references to himself as "fiscal" and "doctor" from the superseding indictment and the transcripts of recorded conversations in this case.  He notes that the heading of each page of transcripts of recorded phone calls prepared by the government includes the label "Ramiro Anturi-Larahondo, a/k/a 'El Doctor,' 'El Fiscal.'"[1]  He argues that the words should be

---

[1] "Doctor" is used in Spanish to mean "lawyer" (as in "doctor of law" or "J.D.") and "fiscal" indicates "prosecutor."

stricken under Federal Rule of Evidence 403 because the suggestion by the government that the defendant was known by "aliases" suggests a nefarious purpose and so is unfairly prejudicial. See Def.'s Mot. to Strike Improper Aliases [Docket Entry 152] at 1-3.  The government has proffered that Anturi is referred to by these words on various taped phone calls that may be introduced as evidence at trial.

As indicated at the motions hearing, the Court will deny this motion, but the government will be somewhat limited in how it may identify Anturi.  Federal Rule of Evidence 403 provides that the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  With respect to the superseding indictment, the Court's practice is not to provide the indictment to the jury at trial.  The Court will not provide the indictment to the jury in Anturi's trial, nor read it to them, and so there is no risk of prejudice to the defendant from the inclusion of any aliases on the indictment.  With respect to transcripts, the government may identify Anturi as "fiscal" or "doctor" on the transcript of any call in which he is referred to by either word.  Identifying the speaker in that way is standard practice at trial for identification purposes, and the risk of prejudice is minimal since the words here are relatively benign.  It would be preferable if the government did not refer to the words as "aliases" or "a.k.a." in transcripts, as these descriptions are slightly prejudicial.  Furthermore, the government may not include the identifying words on the transcripts of any calls in which Anturi is not actually referred to by those words, since the words are not relevant to those transcripts.

e.  Anturi's motion to suppress post-arrest statements to the DEA

Next, Anturi moves to suppress statements he allegedly made to a DEA agent immediately following his arrest in Bogota, Colombia, on February 9, 2012.  He maintains that evidence "intended for a jury must bear some adequate indicia of reliability."  Def.'s Mot. to Supress Post-Arrest Statements Made to the Drug Enforcement Administration [Docket Entry 153] at 2-3.  Based on his counsel's interactions with the agent, Anturi argues that the DEA agent's Spanish language skills are "questionable" and that the government should have recorded Anturi's interrogation or utilized a Spanish language translator.  Id. at 3.  An evidentiary hearing is requested to assess the agent's language abilities.  Id. at 1.  Anturi also argues that the evidence should be suppressed on account of the Mansfield Amendment, which provides that "[n]o officer or employee of the United States may directly effect an arrest in any foreign country as part of any foreign police action with respect to narcotics control efforts, notwithstanding any other provision of law."  22 U.S.C. § 2291(c)(1).

The Court will deny Anturi's motion.  "[T]he jury, not the judge, traditionally determines the reliability of evidence."  Perry v. New Hampshire, 132 S. Ct. 716, 728 (2012).  Anturi has acknowledged that he cites not a single case in which a statement has been suppressed on similar grounds or even that a hearing was held on the issue.  The closest to case support for the motion is dicta from United States v. Nazemian, 948 F.2d 522, 527 (9th Cir. 1991), in which the court affirmed the admission of evidence under circumstances fairly similar to the present context.  Perhaps more importantly, there is no Federal Rule of Evidence or other principle that explicitly addresses the "reliability" of evidence.  On the contrary, to the degree that a general principle might be articulated here, it is that relevant evidence is admissible under Federal Rule of Evidence 401 and a defendant may then attack the weight afforded to the evidence, including on

15

reliability grounds, through cross-examination.  Anturi's strongest argument — articulated more

clearly at the motions hearing than in his motion — is that, under Federal Rule of Evidence 403,

the evidence would be prejudicial to him and would have limited probative value due to its

alleged lack of reliability.  One could imagine circumstances in which an agent's language

proficiency was so poor that his account of a post-arrest conversation would have limited or even

no probative value.  On the other hand, incriminating statements by a defendant himself are

generally considered quite probative, even if the account of the statements by a witness is not

completely reliable.  Here, Anturi has not articulated how he would be <u>unfairly</u> prejudiced by the

admission of evidence, beyond the conclusory assertion that a jury might put substantial weight

on a confession reported by a law enforcement agent.  Furthermore, although not an especially

weighty factor in the Court's decision, here government counsel — apparently himself a native

Spanish speaker — has proffered that the agent is proficient in Spanish.  Under these

circumstances, the Court finds that the danger of unfair prejudice is quite small and cannot

substantially outweigh the evidence's probative value.

The Court is likewise not persuaded by the argument that the Mansfield Amendment

supports suppression of this evidence.  Anturi has presented no persuasive argument as to how an

agent's participation in an arrest actually made by Colombian law enforcement falls under the

statute's prohibition on U.S. officers' "directly effect[ing] an arrest," 22 U.S.C. § 2291(c)(1).

Anturi's interpretation would read the word "directly" out of the statute.  <u>See</u> <u>United States v.</u>

<u>Bourdet</u>, 477 F. Supp. 2d 164, 174-76 (D.D.C. 2007) (Bates, J.) ("A United States agent

providing assistance to a foreign official or merely being present as a foreign official makes an

arrest is more accurately described, at most, as indirectly effecting the arrest . . . .").

Furthermore, even if the Court were to agree that the DEA's behavior here violated the Mansfield

Amendment, it is far from clear that suppression of evidence would be the appropriate remedy.

See id. ("[T]he Mansfield Amendment is far removed from the concerns of a defendant's Fourth

and Fifth Amendment rights.").  But in any event, no violation has been shown.

f.  Anturi's motion to suppress wiretap evidence

Anturi moves to suppress any evidence resulting from a wiretap in the nation of

Colombia on the ground that such a wiretap violated the Fourth Amendment.  He alleges that the

Colombian wiretap was a "joint venture" between the DEA and CNP, in which the CNP acted as

an instrument of American law enforcement in order to obtain a wiretap that would never have

been authorized in the United States.  See Def.'s Mot. to Suppress Wiretap Evidence [Docket

Entry 154] ("Def.'s Wiretap Mot.") at 7-8.  Anturi relies on United States v. Maturo, 982 F.2d 57,

61 (2d Cir. 1992), for the proposition that the Fourth Amendment may attach where the conduct

of foreign officials is so extreme as to shock the conscience, where the conduct of foreign law

enforcement officials rendered them virtual agents of United States law enforcement, or where

the cooperation between the United States and foreign law enforcement agencies is designed to

evade constitutional requirements.  Anturi notes the Supreme Court's holding in United States v.

Verdugo-Urquidez, 494 U.S. 259, 261 (1990), that the Fourth Amendment does not apply "to the

search and seizure by United States agents of property that is owned by a nonresident alien and

located in a foreign country."   The defendant in Maturo, on the other hand, was arrested in New

York and was apparently an American citizen.  See 982 F.2d at 59.  Nonetheless, Anturi

contends that an "extensive body of caselaw" has developed since Verdugo in which federal

courts have suppressed evidence under the conditions articulated in <u>Maturo</u>.  <u>See</u> Def.'s Wiretap

Mot. at 6-7.

      The Court will deny defendant's motion because the Fourth Amendment does not apply

under the present circumstances and Anturi has not alleged facts indicating conduct by foreign

officials that shocks the conscience.  The Court previously concluded that "the Supreme Court

has firmly held that non-resident aliens who have no voluntary connection to the United States

cannot invoke the Fourth Amendment with respect to foreign actions by federal officials."

<u>Bourdet</u>, 477 F. Supp. 2d at 176-77 (citing <u>Verdugo</u>, 494 U.S. at 274-75).  Anturi has not offered

persuasive justification for revisiting <u>Bourdet</u>.  This Court disagrees with Anturi's assessment

that courts have applied the "joint venture" doctrine to foreign national defendants in the Fourth

Amendment context notwithstanding <u>Verdugo</u>.  Defendant cites <u>United States v. Ferguson</u>, 508

F. Supp. 2d 1 (D.D.C. 2007), but the defendant in that case asserted that he was an American

citizen.  <u>See</u> Mot. to Suppress and/or Exclude Wire Tap Intercepted Oral Communications

[Docket Entry 40] at 7, <u>Ferguson</u> (No. 1:04-CR-43-GK).  Anturi also cites <u>United States v.</u>

<u>Karake</u>, 281 F. Supp. 2d 302, 308 (D.D.C. 2003), but that case involved an interrogation, rather

than a search, and therefore the Fifth Amendment, rather than the Fourth.  The Supreme Court

plainly stated in <u>Verdugo</u> that the Fourth Amendment applies to a smaller group of individuals

than the Fifth Amendment, in accordance with the Fourth Amendment's more restrictive text.

<u>See</u> 494 U.S. at 264-65.  And in <u>United States v. Delaema</u>, 583 F. Supp. 2d 104, 106 (D.D.C.

2008), the court explicitly stated that "the Supreme Court's decision in <u>Verdugo</u> forecloses any

Fourth Amendment claim related to the wiretap evidence" (quotation marks omitted).  Judge

Friedman allowed Delaema to "elicit facts" from the government only with respect to whether

the evidence was gathered in a manner shocking the conscience, on the theory that the court

"could invoke its supervisory powers to suppress evidence on that ground."  Id. at 106 (citing

United States v. Mitro, 880 F.2d 1480, 1483 n.4 (1st Cir. 1989) (noting that "there is some

debate" on this point)).

The Court does not believe that further factual development of this issue is warranted in

the present situation.  Verdugo forecloses the claim under the Fourth Amendment.  But even if

such a claim were possible under Delaema, Anturi cannot succeed.  He has not alleged any facts

suggesting that this evidence was gathered in a way that shocks the conscience.  He alleges only

that Colombian law enforcement monitored the telephone lines at issue for a long period of time

and captured an enormous number of calls.  The Court does not believe that this allegation rises

to the level of shocking the conscience.  Without any additional reason to believe that

objectionable facts exist, the Court will deny the motion.

g.  Anturi's motion to unseal the co-defendants' plea agreements and court proceedings

Anturi moves to unseal the plea agreements and colloquies of the eight co-defendants in

this case.[2]  He argues that the First Amendment provides a presumption of public access to

criminal court proceedings.  Def.'s Mot. to Unseal the Co-Defendants' Plea Agreements and

Court Proceedings [Docket Entry 155] at 2.  He notes that under Federal Rule of Criminal

Procedure 11(c)(2), "[t]he parties must disclose the plea agreement in open court when the plea

is offered, unless the court for good cause allows the parties to disclose the plea agreement in

camera."  Anturi cites Washington Post v. Robinson, 935 F.2d 282, 287-88 (D.C. Cir. 1991), in

which the D.C. Circuit concluded that "there is a [F]irst [A]mendment right of access to plea

---

[2] Although the indictment reflects nine co-defendants, co-defendant Alexander Leudo Nieves remains at large.

agreements."  But he relies extensively on United States v. Daum, Cr. 11-102 (D.D.C. Nov. 15, 2011), in which Judge Kessler ordered the unsealing of a plea agreement of a cooperating witness.  The government made an ex parte submission on July 5, 2012, indicating security concerns that it contends justify having proceedings involving co-defendants proceed under seal.

The Court will deny the motion at this time.  To be sure, plea agreements are presumptively public documents; they are the property not of the government or the defendant in question but of the court, and therefore of the public.  But as the D.C. Circuit articulated in Washington Post, "evidence that the release of a plea agreement may threaten an ongoing criminal investigation, or the safety of the defendant and his family, may well be sufficient to justify sealing a plea agreement."  935 F.2d at 291.  In both Washington Post and Daum, the courts indicated that the public record already reflected that the one witness in question was cooperating with the government.  See Washington Post, 935 F.2d at 293; Daum, slip op. at 3-4. This case, by contrast, involves many co-defendants, and which, if any, of them are cooperating with the government is not clear from the public record.  Hence, unsealing plea agreements in this case is much more consequential.  Prosecution of an international drug trafficking conspiracy based in Colombia presents obvious risks to the safety of cooperating witnesses and family members.  The Court is convinced at this time by the government's ex parte filing that unsealing documents would present safety concerns.

Nonetheless, the government remains obligated to turn over anything in the plea documents that presents Brady or Giglio material, as the government itself acknowledged at the August 14, 2012 status conference. The government shall accordingly provide such material to the defense, seeking an appropriate Order of the Court as needed to do so.  Moreover, the Court

will consider this unsealing issue further based on additional information from the relevant

parties.

h.  Anturi's motion to dismiss count one of the superseding indictment

Count one of the superseding indictment charges Anturi with conspiracy to distribute five

kilograms or more of cocaine on board a vessel subject to the jurisdiction of the United States in

violation of 46 U.S.C. §§ 70503 & 70506 and 18 U.S.C. § 2.  Anturi moves to dismiss this count

of the indictment on the ground that the federal criminal statute in question, the Maritime Drug

Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501 et seq., is unconstitutional.  See Def.'s

Mot. Dismiss Count One of the Superseding Indictment [Docket Entry 156] ("Def.'s Count One

Mot.") at 1-2.

Under 46 U.S.C. § 70503(a)(1), "[a]n individual may not knowingly or intentionally

manufacture or distribute, or possess with intent to manufacture or distribute, a controlled

substance on board . . . a vessel of the United States or a vessel subject to the jurisdiction of the

United States."  In 1996, Congress amended the MDLEA to add the provision now codified at 46

U.S.C. § 70504, which states:  "Jurisdiction of the United States with respect to a vessel subject

to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are

preliminary questions of law to be determined solely by the trial judge."  46 U.S.C. § 70504; see

also id. § 70502(c) (defining "[v]essel subject to the jurisdiction of the United States").[3]

Anturi maintains that the 1996 amendment to the MDLEA rendered the statute

unconstitutional under the Supreme Court's decision in United States v. Gaudin, 515 U.S. 506

---

[3] The phrasing of the 1996 amendment was in fact slightly different from the current version at 46 U.S.C. § 70504; it stated:  "Jurisdiction of the United States with respect to vessels subject to this chapter is not an element of any offense. All jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge."  Pub. L. 104-324, § 1138(a)(5), Oct. 19, 1996, 110 Stat. 3989.  The distinction has no impact here.

(1995). According to Gaudin, "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." 515 U.S. at 522-23. Anturi contends that the 1996 amendment violates this principle because Congress did not amend the statutory definition of the offense (46 U.S.C. § 70503(a)(1)) when it provided that jurisdiction was not an element of the offense. See Def.'s Count One Mot. at 4. He acknowledges that this argument was rejected by the Eleventh Circuit in United States v. Tinoco, 304 F.3d 1088 (11th Cir. 2002). But he nonetheless argues that the "plain language" of the MDLEA's definition of the offense makes whether the vessel was "subject to the jurisdiction of the United States" an element of the offense. See Def.'s Reply in Supp. of Mot. to Dismiss Count One of the Superseding Indictment [Docket Entry 199] at 1-2. Hence, Anturi argues that this determination must be made by a jury.

The Court will deny this motion. By enacting the 1996 amendments, Congress explicitly provided that the jurisdictional question is no longer an element of the offense. Within certain limitations, Congress is free to define the elements of the offense as it chooses, see Gaugin, 515 U.S. at 525 (Rehnquist, C.J., concurring) (quoting Staples v. United States, 511 U.S. 600, 604 (1994)), and here Congress plainly chose to remove the question of "jurisdiction" from the elements of the offense. Anturi has not argued that it would be impermissible for Congress to remove "jurisdiction" from the elements of the offense — for example, under the contention that jurisdiction is a "traditional element" of the offense, see Tinoco, 304 F.3d at 1106-07. Rather, he argues that by not changing the definition of the crime, Congress has not removed "jurisdiction" from the elements. But this argument is simply untenable given the explicit text of the 1996 amendments. Anturi is not incorrect that the plain text of the definition of the offense arguably

suggests that "jurisdiction" is an element of the crime, but that reading is explicitly foreclosed by the 1996 amendments.  The plain text of the definition of the offense cannot override the later-enacted plain text of the amendment, which by its very terms removed "jurisdiction" from the elements of the offense.  Furthermore, the Court agrees with Tinoco that "the MDLEA jurisdictional requirement does not raise factual questions that traditionally would have been treated as elements of an offense under the common law" — that is, "the actus reus, causation, or the mens rea of the defendant."  Tinoco, 304 F.3d at 1107-08.  Hence, the Court concludes that whether the vessel in question is "subject to the jurisdiction of the United States" is not an element of the offense and hence may be appropriately decided by the trial judge, rather than a jury.

i.  Anturi's motion to compel production of discovery

Anturi asks the Court to order the government to produce an electronic storage device ("USB drive") allegedly seized during a search of his apartment in Bogota, Colombia.  Def.'s Mot. to Compel Production of Discovery [Docket Entry 229] at 1.  It became clear at the motions hearing that, at least at this moment in time, there is not really a dispute about what evidence needs to be produced, but rather an inability by counsel to communicate and coordinate how the evidence is produced.  Counsel are perfectly capable of resolving this issue without the Court's intervention, and at the August 14, 2012, status conference they informed the Court that there is no further problem.  Hence, the Court will deny the motion.  If further issues arise regarding this piece of evidence that do require the Court's intervention, counsel may bring those matters to the Court's attention at that time.

j.  Government's notice and motion to admit evidence of other crimes

The government has filed a notice and motion of its intent to introduce at trial evidence that may be considered "other crimes, wrongs or acts" pursuant to Federal Rule of Evidence 404(b).  Gov.'s Notice to the Def. and Mot. to Admit Evidence of Other Crimes [Docket Entry 158] ("Gov.'s 404(b) Mot.") at 1.  Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  The government equivocates, however, by stating that "[m]any of the acts set out in this notice may be intrinsic to the crimes charged and thus not subject to the limitations of Rule 404(b)."  Gov.'s 404(b) Mot. at 1.  For evidence admitted under one or both of these theories, the only "limitation" here would be a jury instruction; evidence intrinsic to the crime charged, as opposed to 404(b) evidence, "is admissible for all purposes notwithstanding its bearing on character, thus eliminating the defense's entitlement, upon request, to a jury instruction. "  United States v. Bowie, 232 F.3d 923, 928 (D.C. Cir. 2000) (citing Fed. R. Evid. 105).[4]

To summarize, the government's primary allegation against Anturi is that he was paid to provide sensitive information about the government's investigation of the DTO.  See Gov.'s 404(b) Mot. at 3.  Specifically, the government alleges that Anturi "had turned over, among other documents, a purported [Colombian law enforcement] document to the DTO describing the DTO's activities in moving ton amounts of cocaine via go-fast vessels."  Id.  The government

---

[4] Rule 404(b)(2) also provides that the prosecutor will "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and . . . do so before trial," but that requirement has been met here by the filing of the notice and motion.

claims that payments were made to Anturi through an intermediary and that in exchange the DTO believed that it was receiving protection for the organization from law enforcement.  Id.

The evidence that is the subject of the notice and motion falls into two categories.  The first set of evidence involves co-defendant Marlon Valencia Portocarrero.  The government indicates that Valencia will testify that he met Anturi in approximately 2008 and sought Anturi's assistance with a drug charge that had been pending against Valencia for about ten years.  Gov.'s 404(b) Mot. at 3-4.  The government states that Valencia will testify that Anturi assisted him with obtaining dismissal of this charge by hiring a private attorney to assist him in filing the necessary motions, in exchange for payments made through intermediaries spread over time in small amounts.  Id. at 4-5.  The government alleges that this transaction linked Anturi to the DTO and enabled him to later assist the DTO.  Id. at 5.

The second set of evidence involves a confidential informant.  The government indicates that the confidential informant met Anturi in 2001 or 2002 through Javier Garcia Rojas, a well-known drug trafficker.  Id. at 5-6.  According to the government, Anturi knew that both the informant and Rojas trafficked narcotics, was allowed to use Rojas' ranch for personal use, and warned the informant about extortion attempts on the informant.  Id. at 6.  The government alleges that, in exchange for payment, Anturi removed the informant's name from a criminal investigation and also advised the informant regarding another criminal investigation.  Id. at 6-7. Finally, the government indicates that the informant will testify that Anturi was paid to bring other Columbian law enforcement officials to the informant in order to have investigations resolved.  Id. at 7.

The government argues that the evidence involving Valencia is admissible under Rule 404(b) because it is shows the relationship between Anturi and a member of the DTO (Valencia), establishing why the two trusted each other with respect to the DTO-related conduct and why the DTO perceived that Anturi was willing to protect drug traffickers from law enforcement.[5]  The government contends that the evidence involving the confidential informant is "relevant to show [Anturi's] intent to join and participate in the charged cocaine conspiracy, his motive for joining that conspiracy, his modus operandi in getting involved with narco-traffickers, his opportunity to obtain and possess investigatory information related to his co-defendants, his plan to protect the DTO from prosecution, his knowledge of cocaine trafficking, his identity as one of the conspirators, and the absence of mistake or accident explaining defendant's involvement in the charged conspiracy."  Gov.'s 404(b) Mot. at 9.  The government also maintains that the evidence is relevant to show the relationship between Anturi and large-scale cocaine traffickers and to corroborate witness testimony.  Id. at 10-12.

Beyond raising the issue, the government has not focused much attention on whether the evidence actually is intrinsic to the crime charged.  The D.C. Circuit has held that Rule 404(b) does not apply to intrinsic evidence.  Evidence is intrinsic if it "is of an act that is part of the charged offense" or if the acts were "performed contemporaneously with the charged crime" and "facilitate the commission of the charged crime."  Bowie, 232 F.3d at 929.  Evidence is not necessarily intrinsic, however, simply because it "completes the story" or "explains the

---

[5] The government also indicates that the evidence of Anturi's involvement with Valencia will corroborate other testimony about Anturi's involvement with Valencia.  See Gov.'s 404(b) Mot. at 12.  But it is hard to see how this somewhat circular "corroboration" really provides an independent basis for admitting the testimony.

circumstances" of the charged offense.  Id.  Intrinsic evidence is admissible unless otherwise prohibited.

Anturi contends that the evidence should not be admitted under Rule 404(b).  He argues that his role in the dismissal of Valencia's charges was not obviously illegal or improper, making this conduct irrelevant to a conspiracy to import cocaine and not within the 404(b) "categories of evidence."  Def.'s Opp'n to Gov.'s Mot. to Introduce Other Crimes Evidence [Docket Entry 177] ("Def.'s 404(b) Opp'n") at 3-5.  Anturi further argues that the evidence is prejudicial under Federal Rule of Evidence 403 because the government's intention is to show his bad character and association with notorious criminals.  Id.  Additionally, he contends that the evidence is not reliable, citing United States v. Huddleston, 485 U.S. 681, 690 n.6 (1988), for the proposition that "the strength of the evidence establishing the similar act is one of the factors the court may consider when conducting the Rule 403 balancing."  Anturi also suggests that the Court conduct an evidentiary hearing with Valencia regarding his testimony to assess his credibility.  Id. at 5-6.

With respect to evidence relating to the confidential informant, Anturi contends that the alleged conduct of providing information about investigations by Colombian law enforcement is not relevant to charges that he was a member of an international drug trafficking conspiracy.  Id. at 6-7.  Anturi repeatedly states that "[e]vidence that shows he was corrupt is not germane to show participation in the charged conspiracy."  Id. at 6.  He asserts that evidence that he is corrupt is prejudicial and that the court should conduct an evidentiary hearing into the confidential informant's "credibility."  Id. at 7-8.

The Court will grant the government's motion.  The government has offered a satisfactory explanation of how the evidence relating to the confidential informant is relevant and admissible

under Rule 404(b).  At the very least, evidence that Anturi previously knowingly protected active

narcotics traffickers from law enforcement is relevant to his specific intent to engage in similar

conduct on this occasion.  That is, as proffered by the government, the evidence could show that

Anturi knew that the people he was helping were trafficking drugs and that he intended to help

them avoid detection in their criminal activities, as he had done in the past.  The evidence could

also counter Anturi's assertion that he was only helping the coconspirators because he thought

they were no longer trafficking narcotics.  In truth, the objection to the evidence relating to the

confidential informant really seems like an objection to the government's theory of the case —

that is, Anturi does not believe that protecting drug traffickers from apprehension by the

Colombian government warrants a conviction for "international drug trafficking."  But protecting

members of a conspiracy from apprehension by law enforcement certainly _could_ constitute

membership in a conspiracy, and the Court is not willing, on the basis of the alleged facts at this

time, to conclude that the proffered evidence is irrelevant to criminal acts.  Anturi is correct that

the evidence is prejudicial, because it reflects that he associated with criminals and committed

unsavory, and possibly illegal, acts.  But, of course, 404(b) evidence is frequently prejudicial,

and the Court finds that the evidence's abundant relevance is not substantially outweighed by the

danger of unfair prejudice — the test under Rule 403.

With respect to the Valencia evidence, the defendant is correct that the allegations, as

expressed by the government, do not seem to reflect criminal conduct.  However, Rule 404(b),

by its very text, applies to "[e]vidence of a crime, wrong, _or other act_" (emphasis added).  Since

Valencia was allegedly a member of the DTO, the evidence is relevant to showing the

relationship between Anturi and the DTO and, more specifically, that he knew the nature of the

assistance he allegedly provided to the coconspirators.  Although there is some possibility of prejudice from the suggestion that Anturi associated with a known criminal, the risk of unfair prejudice does not substantially outweigh this clear relevance.

The Court sees no need to hold an evidentiary hearing about the "reliability" or "credibility" of either of the witnesses.  As indicated above, no Federal Rule of Evidence directly requires a district court to inquire into the reliability of testimony.  Rather, the issue should be analyzed under  Federal Rules of Evidence 104 and 402 as they interact with Rules 403 and 404.  In other words, the Court must assess the relevance (that is, probative value) of the evidence, in which reliability is one consideration, as compared to the risk of unfair prejudice.  The Supreme Court's opinion in Huddleston is completely consistent  with this reasoning.  See Huddleston, 485 U.S. at 689 ("[A] preliminary finding by the court that the Government has proved the act by a preponderance of the evidence is not called for under Rule 104(a).  This is not to say, however, that the Government may parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo. Evidence is admissible under Rule 404(b) only if it is relevant. . . . In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."); see also id. at 689 n.6 (rejecting requirement, under Rule 403, that "the court conclude[] by a preponderance of the evidence that the defendant committed the similar act . . . for the same reasons that a preliminary finding under Rule 104(a) is inappropriate").  As articulated above, the evidence offered by the government has clear probative value.  Other than casting aspersions on the character of the two witnesses, Anturi has not articulated with any specificity why the witnesses' testimony would be so unreliable as to

thoroughly undermine its relevance or even warrant an evidentiary hearing on the subject.

Hence, the Court concludes that these matters are more appropriate for handling at trial, most

obviously through appropriate cross-examination by defense counsel.

Finally, the Court determines that, at least at this time, the evidence must be admitted as

Rule 404(b) evidence, rather than evidence "intrinsic" to the charged crimes.  The Court takes

seriously the D.C. Circuit's statement in <u>Bowie</u> that evidence is not necessarily intrinsic simply

because it "completes the story" or "explains the circumstances" of the charged offense.  <u>See</u> 232

F.3d at 929.  The nature of this evidence — explaining how Anturi, during an earlier time period,

had other interactions with drug traffickers and came into contact with a member of the DTO —

seems to fall into this category.  Furthermore, although some of the described acts arguably

"facilitate[d] the commission of the charged crime[s]," they do not seem to have been

"performed contemporaneously with the charged crime[s]," and so do not fall within the four

corners of <u>Bowie</u>'s description of intrinsic evidence.  <u>Id.</u>  If further factual development at trial

puts the evidence in a different light, the Court will at that time reconsider under what theory the

evidence is admissible.  For now, it is admissible only under Rule 404(b).

III.  <u>Conclusion</u>

For the reasons stated above, it is hereby

**ORDERED** that [148] defendant's motion for a pre-trial determination on the

admissibility of alleged co-conspirator statements is **DENIED**; it is further

**ORDERED** that [149] defendant's motion to exclude evidence of events predating his

membership in the charged conspiracies is **DENIED**; it is further

**ORDERED** that [150] defendant's motion for immediate production of transcripts is **DENIED**; it is further

**ORDERED** that [151] defendant's motion for production of the confidential informant file of Jorge Baena is **DENIED**; it is further

**ORDERED** that [152] defendant's motion to strike improper aliases is **DENIED**; it is further

**ORDERED** that [153] defendant's motion to suppress post-arrest statements to the DEA is **DENIED**; it is further

**ORDERED** that [154] defendant's motion to suppress wiretap evidence is **DENIED**; it is further

**ORDERED** that [155] defendant's motion to unseal the co-defendants' plea agreements and court proceedings is **DENIED**; it is further

**ORDERED** that [156] defendant's motion to dismiss count one of the superseding indictment is **DENIED**; it is further

**ORDERED** that [158] the government's notice and motion to admit evidence of other crimes is **GRANTED**; and it is further

**ORDERED** that [229] defendant's motion to compel production of discovery is **DENIED**.

**SO ORDERED.**

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>August 15, 2012</u>