**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 10-018-10 (JDB) |
| | ) | |
| RAMIRO ANTURI LARRAHONDO (10) | ) | |
| | ) | Hon. Judge John D. Bates |
| a/k/a "Fiscal" a/k/a "Doctor," | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S MOTION FOR PRETRIAL DETERMINATION OF JURISDICTION UNDER THE MARITIME DRUG LAW ENFORCEMENT ACT

The United States of America, by and through the undersigned attorneys, respectfully

moves this Honorable Court to make a pretrial determination that the four maritime vessels at

issue in the instant case are subject to United States jurisdiction under the Maritime Drug Law

Enforcement Act (MDLEA).  Under the MDLEA, determining the jurisdiction of maritime

vessels is a preliminary question of law specifically reserved for the Court.  See 46 U.S.C. §

70504(a).  The maritime vessels at issue in this case are go-fast vessels and a cargo vessel used to

transport multi-ton quantities of cocaine from Colombia.   As set forth in detail below, the

maritime vessels are subject to the jurisdiction of the United States pursuant to 46 U.S.C. §

70502(c).[1]

---

[1]      The Federal Rules of Evidence generally are not applicable to preliminary
questions of fact to be decided by the Court, see Fed.R.Evid. 1101 & 104(a), and therefore, the
Government asks the Court to grant the instant motion based upon the evidence submitted with
this motion.

## I.  STATEMENT OF THE CASE

A.    Procedural History

On January 23, 2010, a District of Columbia Grand Jury returned a superseding indictment against defendants SILVIO MONTANO VERGARA, MARLON VALENCIA-PORTOCARRERO, DAVID ORLANDO ANDRADE, RAUL ARTURO FERNANDEZ, ALEXANDER LEUDO NIEVES, HEINER ARBOLEDA SATIZABEL, EDWIN ARNULFO MORENO IBARRA, CARLOS ALBERTO GOMEZ REINA, JORGE JUAN PERLAZA RAYO, and RAMIRO ANTURI LARRAHONDO, charging them with conspiracy to distribute five kilograms or more of cocaine on board a vessel subject to United States jurisdiction, in violation of Title 46, United States Code, Section 70506(b)(Count1), and conspiracy to distribute five kilograms or more of cocaine knowing and intending that it would be illegally imported into the United States in violation of Title 21, United States Code, Section 959(a)(Count 2).

Nine of the defendants have been extradited from Colombia.  The tenth defendant, ALEXANDER LEUDO-NIEVES, was arrested in Costa Rica on or about June 9, 2011, and has not yet been extradited.  Defendant RAMIRO ANTURI LARRAHONDO (ANTURI) is set for trial on October 15, 2012.

B.    The Crime

1.    The DTO and the Cocaine Transportation Scheme

The charges stem from an investigation into a maritime drug trafficking organization (DTO) led by MONTANO VERGARA and VALENCIA-PORTOCARRERO (the MONTANO-VALENCIA DTO).  With the assistance of a series of judicially authorized Colombian wire interceptions, in November 2008, DEA and Colombian investigators became aware that the

MONTANO-VALENCIA DTO was launching a series of go-fast vessels from the Pacific Coast of Colombia.

Based on the intercepts and subsequent debriefings by cooperating witnesses, law enforcement agents determined that the  MONTANO-VALENCIA organization acquired the go-fast vessels in Buenaventura, Colombia through commercial outlets and then transported them to the departure location.  There, all registration numbers and flags were removed, the cocaine bales and provisions were loaded onto the vessels, and the cocaine-laden vessels departed from Colombia's Eastern Pacific coast.  The go-fasts traveled through international waters, making several stops at established way points, and then arrived and were off-loaded in Costa Rica.

Law enforcement also determined that VALENCIA PORTOCARRERO, as the "tax collector" for the paramilitary organization that controlled that region, arranged to collect a tax of $100 per kilogram of cocaine on board those departing go-fast vessels.  ARBOLEDA-SATIZABAL was MONTANO's right- hand-man and served as an intermediary between the drug capos and the go-fast vessel coordinators.  ARBOLEDA-SATIZABAL also served as an information conduit to both JORGE PERLAZA RAYO, who handled the logistics for outfitting the go fast vessels, and EDWIN MORENO IBARRA, who directed the go fast crews as they transported the cocaine from Colombia to Costa Rica.

2.      The Subject Vessels

With the assistance of information obtained from judicially authorized Colombian wire intercepts, law enforcement seized multi-ton loads of cocaine from the vessels used by the DTO:[2]

---

[2]      There is an additional load seized on February 2, 2009, by Panamanian law enforcement.  They recovered a beached, abandoned go-fast vessel with approximately 2,458 kilograms of cocaine nearby. As with the December 1st and 12th go-fast seizures discussed infra,

1)      December 1, 2008:  During the early morning hours of December 1, 2008, a go-fast vessel traveled through international waters off the coast of Costa Rica.[3] The Costa Rican Coast Guard, alert to the probable arrival of cocaine-laden vessels, first encountered the go-fast vessel in its territorial waters off the coast of Puntarenas, Costa Rica.  The Costa Rican Coast Guard attempted to apprehend the vessel, but it fled towards the mouth of the Jesus Maria River near Puntarenas, Costa Rica, and the crew beached and abandoned the cocaine-laden vessel. Costa Rican authorities recovered 130 bales (approximately 2,600 kilograms) of cocaine.[4]  Some of the recovered bricks of cocaine bore logos of popular American cartoon characters "Tweety" and "Tweety & Sylvester" affixed to them.[5]

An inventory of the abandoned go-fast vessel confirmed there was no flag or registration documents on the vessel.[6]  Additionally, Costa Rican law enforcement located blue fuel drums, clothing, food, a compass, an AK-47 rifle, and an Iridium satellite phone on the vessel.  The

_____

the cocaine bricks had logos of "Tweety & Sylvester."  The Panamanian law enforcement also recovered nearby an AK-47 rifle and a GPS device, the data from which showed the route of the go fast vessel traveling through international waters from Colombia to Panama.  Wire intercepts connect this load to the MONTANO-VALENCIA DTO.

[3]      Costa Rica recognizes a 12 mile limit to its territorial waters.  See Article 6 of Constitution of Costa Rica, as Amended by Decree No. 5699, June 5, 1975, cited in www.un.org/depts/los/legislationandtreaties/index.htm.

[4]      See Exhibit 1 & 2 (Excerpt of 79 page Costa Rican Drug Enforcement Police (PCD) report of drug seizure, in Spanish and English, respectively).

[5]      See Exhibit 3 (Photo of Logos affixed to cocaine).

[6]      See Exhibits 4 & 5 (Statement of Port Commander Jose Luis Paredes Araya, Costa Rican Ministry of Public Works & Transportation, in Spanish and English, respectively). See also Exhibit 6 (Photo of the abandoned, cocaine laden vessel with an obliterated registration number on the side of the boat).

satellite phone was assigned phone number 00881631623594.[7]

Colombian judicial wire intercepts from the investigation connect this go-fast vessel to the MONTANO-VALENCIA DTO.  On December 1, 2008, at 4:36:36, EDWIN MORENO IBARRA informed a go-fast coordinator (FNU LNU a/k/a "Guacho") in code that there were problems with the go-fast vessel "Titi" (later referred to as "La Titi") as aerial surveillance was in the area  ("[t]hat little animal is hanging around there, the one that's flying around").[8]  Guacho responded that the number associated with "Titi" was 23594, the last five digits of the satellite phone on-board the abandoned Costa Rican go-fast vessel.[9]

The intercepts and Iridium satellite phone records also confirmed that the vessel traveled through international waters.  On November 30, 2008, at 16:26:24 hours, and 19:10:06 hours, MORENO IBARRA provided the coordinates for the Titi's route from Point "Santos" (07 15 00/81 14 00) towards Point "Mama," and the coordinates for Point "Mama" as 09 09 892/84 12 750, respectively.[10]  Point "Mama" is located in international waters.  Iridium satellite phone records confirm that in the early morning hours of December 1, 2008, the Satellite Phone 00881631623594 was at location 9.0925/-84.1863.  These coordinates are also in international waters.

---

[7]   See Exhibits 2, at p. 4 (Costa Rican report referencing Iridium Satellite Phone) (Note: page numbers refer to the numbers at the bottom middle of each page of the report) and Exhibit 7 (video screen shot of Iridium satellite phone recovered from vessel).

[8]   Because the U.S.S. Underwood was on patrol in international waters off the coast of Costa Rica near Puntarenas, it is possible that the go fast vessel crew detected a helicopter deployed from the U.S.S. Underwood.

[9]   See Exhibit 8 (Transcript of intercepted call, December 1, 2008, 4:36:36).

[10]   See Exhibit 9 (Transcript of intercepted call, November 30, 2008, at 19:10:06).

2)      December 2, 2008:  During the waning hours of December 1, 2008, and into the

early hours of December 2, 2008, the U.S. Coast Guard (U.S.C.G.) law enforcement detachment

on board the U.S.S. Samuel B. Roberts encountered a go-fast vessel in international waters,

approximately 28 nautical miles off the coast of the Azuero Peninsula in Panama.[11]  The U.S.

Navy helicopter under the control of the U.S.C.G. approached the go fast and activated its rescue

and search lights, after which the go-fast immediately stopped in the water.[12]  Four individuals

were seen on board the 40-foot go-fast vessel moving frantically around the vessel as it was

stopped.  U.S.C.G. personnel also spotted approximately 80 white and black bales on-board the

vessel.  After about five minutes, the go-fast vessel increased speed and headed towards

Panamanian territorial waters.  During the resulting chase by the U.S. Navy helicopter, the go-

fast crew jettisoned the bales into the water, approximately 2,100 kilograms (41 bales) of which

were later recovered by the U.S.C.G. and determined to contain cocaine.[13]  The go-fast crew and

vessel ultimately evaded capture and returned to Panamanian territorial waters.

Law enforcement has also connected this go-fast vessel to the MONTANO-VALENCIA

DTO.  In two Colombian wire intercepts of MORENO IBARRA's phone on December 1, 2008,

at 22:13:35 hours and 23:42:24 hours, go-fast coordinator MORENO IBARRA received a report

---

[11]      U.S. Coast Guard officers are authorized to conduct searches on the high seas.  14
U.S.C. §89(a).

[12]      See Exhibit 10 (Statement of U.S.C.G. Officer Ryan Patterson, who was in the
helicopter and took videotape of the go-fast pursuit).  Using night vision goggles, Officer
Patterson also observed fourteen 55-gallon drums on board the vessel.

[13]      See Exhibit 11 (Statement of Officer Gregory Sickels, identifying the location
where the go-fast and the cocaine were located, and the number of bales of cocaine that were
recovered).

6

that law enforcement was chasing the drug trafficking organization's go fast vessel ("[t]hat turned ugly today, partner, so then we had to leave... running from there...."), and the crew reported that they dumped the load (Moreno-Ibarra: "[s]o then you guys threw all of that away?" UM: "They were right on top of us, man, yeah, like two hours, with everything....").[14]  A few hours later, on December 2, 2008, at 00:49 hours, in an intercepted call, MORENO reported in code that some of the load had been saved.   Furthermore, as with some of the cocaine packages seized in the December 1, 2008, go-fast vessel seizure, a "Tweety" logo was affixed to some bales of cocaine.[15]

       3)     December 12, 2008:  On or about December 12, 2008, U.S.C.G. officers on board a helicopter from the U.S.S. Underwood pursued a go-fast vessel in international waters off the coast of Colombia.  The U.S.C.G. Officer observed that the go-fast flew no flag, had no visible sign of nationality, had no navigation lights, and had no antenna for radio communications.  The go-fast had large packages on the bow consistent with bulk contraband.

       The go fast vessel engaged in evasive maneuvers during the pursuit.  The vessel was driving erratically swerving trying to avoid the law enforcement helicopter from flying right next to it.  Crew members threw bales from the go-fast during the pursuit.  Although the go-fast vessel and crew escaped, U.S.C.G. officers recovered approximately 1,500 kilograms of cocaine (63 bales) that the go-fast vessel's crew tossed overboard.[16]

---

[14]    See Exhibits 12 and 13 (Transcripts of Intercepted Calls on December 1, 2008, at 22:13:35 and 23:42:24).

[15]     See Exhibit 14 (Photo of "Tweety" logo from December 2, 2008, seizure).

[16]    See Exhibit 15 (Statement of U.S.C.G. Officer Sparks, who was in the helicopter and took videotape of the go fast pursuit).

Colombian wire intercepts also confirm that this go-fast was controlled by the MONTANO-VALENCIA organization.  On December 12, 2008, at 21:14 hours, MORENO IBARRA informed MONTANO in code that the go fast was being followed by a helicopter, and MORENO had directed the go-fast crew to return and not to stop (MORENO IBARRA: "That guy called me.  He said that he has the bird on top of him....I'm telling him to head back....").[17] And as with the December 1 and December 2, 2008 seizure, a "Tweety & Sylvester" logo was affixed to some of the recovered cocaine bricks.[18]

        4)      The M/V Charmer

Having lost almost nine metric tons of cocaine, the MONTANO-VALENCIA DTO sought an alternate drug trafficking route northward to avoid interdiction by law enforcement. Beginning in February 2009, they attempted to hire an undercover DEA Agent and a cooperating source (referred to as CS-Arturo) who posed as maritime shipping representatives who could transport a multi-ton load of cocaine on a cargo vessel from Barranquilla, Colombia to Honduras.

In or about early March 2009, CS-Arturo met with ANDRADE and ARTURO FERNANDEZ in Honduras.  During the meeting, they negotiated the transportation of several hundred kilograms of cocaine on board the cargo vessel known as the Motor Vessel (M/V) Charmer, controlled by CS-Arturo and the DEA undercover agent.  CS-Arturo showed ANDRADE a photograph of the M/V Charmer, which was registered in the Republic of Togo,[19]

---

[17]    <u>See</u> Exhibit 16 (Transcript of intercepted call, December 12, 2008, 21:14:08).

[18]    <u>See</u> Exhibits 17 (Statement of U.S.C. G. Officer Kelvin Morgan) and 18 (photo of logo affixed to cocaine).

[19]    <u>See</u> Exhibits 19 (Photograph of the M/V Charmer) and 20-22 (M/V Charmer's registration papers).

and discussed a proposed route for the drug movement from Barranquilla to Honduras.  Shortly

thereafter, on March 8, 2009, upon learning from CS-Arturo and the DEA undercover officer that

the M/V Charmer was available for inspection, ANDRADE directed his associate, "Kenneth," to

inspect the vessel while it was stationed approximately 1.53 miles off the Coast of Isla Guanaja,

Honduras.[20]  The inspection was conducted shortly thereafter while the vessel was in Honduran

territorial waters.[21]  Based on the inspection by Kenneth, the MONTANO drug trafficking

organization increased the quantity from 600 kilograms to a multi-ton quantity.

MONTANO, ANDRADE and the DEA undercover officer continued to engage in

lengthy telephonic negotiations over various details of the scheme.  On March 28, 2009, CS-

Arturo met with MONTANO in Boca del Toro, Panama, to discuss the details and finalize the

transaction to transport the cocaine on-board the M/V Charmer from Barranquilla, Colombia to

Honduras.  Under the agreement, MONTANO would pay $1,000 per kilogram for  CS-Arturo

and the DEA undercover officer to transport 2.7 tons of cocaine on-board the M/V Charmer from

Barranquilla to Honduras, and CS-Arturo would remain with the LEUDO-NIEVES as security

during the four day period while the load was being transported to Honduras.[22]  Forty percent of

the transportation fee was to be paid up-front prior to the delivery of the cocaine in Barranquilla.

---

[20]     See Exhibit 23 (M/V Charmer's location on March 8, 2009).

[21]     Honduras is a signatory to the U.N. Convention on the Law of the Sea
(UNCLOS), and consistent with the Convention, Section 2, Article 3, Honduras claims a 12 mile
breadth for its territorial waters.  See www.un.org/depts/los/convention_agreements/texts/unclos
(Text of UNCLOS); www.un.org/depts/los/legislationandtreaties/index.htm (Identifying
Honduras as signatory to treaty and stating that it claims 12 miles of territorial waters).

[22]     For his safety, after the load was delivered, CS-Arturo was arrested on a purported
immigration violation at the airport in Bogota as he and LEUDO-NIEVES were boarding a flight
to Honduras.

MONTANO approved the deal, and the MONTANO-VALENCIA DTO subsequently paid over $800,000 to CS-Arturo in Guatemala, as an up-front transportation fee.

On April 23, 2009, the MONTANO-VALENCIA DTO delivered 2,730 kilograms of cocaine to Colombian undercover officers in Barranquilla, Colombia.[23]  The load was delivered by truck to a parking lot where undercover Colombian law enforcement officers took custody of the cocaine.[24]

The M/V Charmer arrived in Honduras in early May 2009, and ANDRADE mistakenly believed that the MONTANO-VALENCIA DTO's cocaine was on board the vessel.   Concerned about the load apparently arriving late and anxious after having lost CS-Arturo as insurance, ANDRADE called the DEA undercover officer declaring that he controlled the police in that area of Honduras and announcing that his people would kill anyone (other than ANDRADE's associate, Kenneth) who attempted to remove the cocaine from the M/V Charmer.[25]  The DEA undercover officer eventually convinced the MONTANO organization that the cocaine had been seized on the high seas by law enforcement and therefore, the cocaine would not be found on board the M/V Charmer.

## ARGUMENT

Pursuant to 46 U.S.C. § 70504(a), the threshold jurisdictional issue of the vessels is a preliminary question of law for the Court.  United States v. Angulo-Hernandez, 565 F.3d 2, 11 (1st Cir. 2009)("Jurisdiction under the MDLEA is not an element of the offense; it is a

---

[23]     Wire intercepts indicated that VALENCIA was an investor in the load.

[24]     The cocaine was never actually loaded onto the M/V Charmer.

[25]     See Exhibit 24 (Transcript of consensually recorded conversation between ANDRADE and DEA undercover officer, May 5, 2009).

'preliminary question[] of law to be determined solely by the trial judge,'" citing § 70504);

United States v. Vilches-Navarrete, 523 F.3d 1, 19-20 (1st Cir. 2008)(finding that jurisdictional

issue "is not an element of the crime in the requisite sense and may be decided by a judge");

United States v. Tinoco, 304 F.3d 1088, 1107-1110 (11th Cir. 2002)(upholding constitutionality

of court, rather than jury, determining jurisdiction under MDLEA); see also United States v.

Estupinan, 453 F.3d 1336 (11th Cir. 2006)(per curiam)(same).

The United States asserts MDLEA jurisdiction over the M/V Charmer and the three go-

fast vessels (December 1, 2008; December 2, 2008; and December 12, 2008) involved in the

drug trafficking conspiracy.  As discussed further below, U.S. jurisdiction exists over the Togo-

flagged M/V Charmer as the foreign governments waived jurisdiction and consented to the

enforcement of United States law by the United States.  In addition, U.S. jurisdiction exists over

the three cocaine laden go-fast vessels that departed Colombia from which cocaine was seized on

December 1, 2008; December 2, 2008; and December 12, 2008, as they were "vessels without

nationality."

A.     The MDLEA and Applicable Law

The MDLEA renders it unlawful for any individual to "knowingly or intentionally ...

distribute, or possess with intent to...distribute, a controlled substance on board ... a vessel

subject to the jurisdiction of the United States."  46 U.S.C. § 70503.  Section 70506(b) of Title

46 renders it unlawful to conspire to violate Section 70503.  The penalties for conspiracy are the

same as for violations of Section 70503.[26]

---

[26]     Section 70506(a) of Title 46 states that the penalties for violating Section 70503
are the same as those set forth in Title 21, United States Code, Section 960 (establishing a
sentencing range of 10 years to life for unlawful distribution of five kilograms or more of cocaine
knowing and intending that it will be illegally imported into the United States).

The MDLEA defines a vessel "subject to the jurisdiction of the United States" to include: "(A) a vessel without nationality; [...] (C) a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States; [...] (E) a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States."  46 U.S.C. § 70502(c).  "Consent" or "waiver of objection" by a foreign government may be obtained by radio, telephone, or similar oral or electronic means, and is "proven conclusively by certification of the Secretary of State or the Secretary's designee."  46 U.S.C. § 70502(c)(2)(A) and (B).

Although Section 70502(d)(1) sets forth three categories of "vessels without nationality," these categories are not exhaustive.  See United States v. Rosero, 42 F.3d 166, 170 (3rd Cir. 1994)(Alito, J)(interpreting predecessor MDLEA statute and finding that 46 U.S.C. App. §1903(c)(2) "does not attempt to provide an exhaustive definition of the term 'vessel without nationality'"); see also United States v. Matos-Luchi, 627 F.3d 1, 4 (1st Cir. 2010)(finding that the "listed examples do not exhaust the scope of section 70502(d)"); United States v. Valdez, 84 F. Supp.2d 237, 239 (D.PR. 1999)(vessels without nationality list under Section 1903(c)(2) is not exhaustive).  Instead, the MDLEA merely states that the phrase "vessel without nationality" **"includes"** these circumstances.[27]

---

[27]      In contrast, a "claim of registry" under 46 U.S.C. § 70502(e) **"includes only"** possession and production of documents pursuant to the Convention on the High Seas; flying a nation's ensign or flag; or a verbal claim of registry by the master.  46 U.S.C. §70502(e)(emphasis added).  Both Rosero and Mato-Luchi found that by using the open-ended description "includes," under Section 1903(c)(2), and its successor, Section 70502(d)(1), respectively, Congress intended the list of vessels without nationality to be non-exhaustive.  As then-Circuit Judge Alito noted in Rosero, Congress's choice of words and the contrast between "includes" (to describe vessels without nationality) and "includes only" (to describe a claim of registry):

dispels any suggestion that the statutory drafters sloppily used the term 'includes' [in the

Relevant precedent firmly establishes that the term "vessel without nationality" in the MDLEA incorporates the concept of a "stateless vessel" as understood by traditional concepts of international law.  Rosero, 42 F.3d at 171  (finding that "vessel without nationality" had developed meaning under international law, and where Congress uses words that have settled meaning in equity or common law, then court should infer absent contrary evidence in the statute, that Congress meant to incorporate the established meaning of terms); Matos- Luchi, 627 F.3d at 4 ("At the very least, Congress intended to include in section 70502(d), in addition to the specific examples given, those vessel that could be considered stateless under customary international law").  Vessels that fly no flag are "stateless" under international law.  Matos-Luchi, 627 F.3d at 5 ("Under international law, every vessel must sail under the flag of one and only one state; those that sail under no flag or more than one flag enjoy no protection," citing 1 L. Oppenheim, International Law, §261, at 595-96 (H. Lauterpacht ed., 8th ed 1955) and Convention on the High Seas art 6, April 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82).

As the court recognized in Matos-Luchi, the "controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality."  Matos-Luchi, 627 F.3d at 6.  A vessel may be deemed stateless "and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification."  Id.; see also United States v. Sinisterria, 237 Fed. Appx. 467 (11th Cir.

---

stateless vessel section] when they meant to say 'only includes.'  Consequently, it seems clear from the statutory language that the term 'vessel without nationality' encompasses, not only those vessels that come within the categories described..., but other vessels as well."  Rosero, 42 F.3d at 170.

2007)(rejecting challenge to guilty plea based on theory that go-fast vessel was "stateless" where captain failed to make claim of registry after he and his crew were rescued by U.S. Coast Guard following pursuit in international waters; go-fast crew set fire to cocaine-laden vessel during pursuit and crew jumped overboard); United States v. De La Cruz, 443 F.3d 830 (11th Cir. 2006)(per curiam)(finding go fast vessel that was seized in international waters in Eastern Pacific with 1800 kilograms of cocaine to be stateless where vessel flew no flag, carried no registration, crew made no claim of registry and vessel's captain concealed himself among the crew and failed to identify vessel's nationality).

It is "not enough that a vessel have a nationality; she must claim it and be in a position to provide evidence of it." Matos-Luchi, 627 F.3d at 6, citing Anderson, Jurisdiction over Stateless Vessels on the High Seas: An Appraisal Under Domestic and International Law, 13 J. Mar. L & Com. 323, 341 (1982). Abandonment of the vessel is the antithesis of claiming and providing evidence of nationality. See United States v. Gonzalez, 311 F.3d 440, 449 (1st Cir. 2002)(finding a sailing vessel to be stateless where U.S. Coast Guard rescued the crew of a partially submerged go-fast on the high seas, where U.S. Coast Guard could discern no markings of nationality on the vessel). In Gonzalez, Judge Torruela observed in his concurring opinion that "[a]lthough [he had] not found any cases with facts similar to the present case, that is, where no one was aboard the vessel when it was approached, [he did] not think it is a stretch to say that an unoccupied vessel completely lacking in evidence of registry or nationality is a stateless vessel." Gonzalez, 311 F.3d at 449. See also Rosero, 42 F.3d at 174 ("[W]hen the master in charge of a ship flees and leaves no one in charge," vessel may be deemed stateless).

Although the Government has not identified any D.C. Circuit case setting forth the burden of proof for establishing MDLEA jurisdiction, the preponderance the evidence standard

14

has been imposed in other jurisdictions.  In United States v. Matos-Luchi, 627 F.3d 1 (1st Cir.

2010), a maritime case in which the U.S. Coast Guard arrested the crew of a small fishing vessel

in international waters off the Dominican coast, the Court held that the preponderance of the

evidence was the appropriate proof standard.  Matos-Luchi, 627 F.3d at 5 ("In our view,

Congress intended it to be a preliminary issue, like venue or other judge-determined issues, to be

proven by a preponderance of the evidence standard").

In the instant case, the Government submits that it has proven jurisdiction beyond a

reasonable doubt, let alone by preponderance of the evidence, by virtue of the U.S. State

Department certifications and the fact that the go-fast vessels are deemed "stateless."  See United

States v. Tinoco, 304 F.3d 1088, 1114 n. 25 (11th Cir. 2002) (finding the Government met its

burden to establish jurisdiction irrespective of whether the burden of proof was beyond a

reasonable doubt or by a preponderance of the evidence through a U.S. State Department

certification).

B.      MDLEA Jurisdiction Over the M/V Charmer

As discussed previously, the co-defendants in this case conspired to transport 2.7 tons of

cocaine on board the M/V Charmer from Colombia to Honduras.   Co-conspirators inspected the

vessel in Honduran waters and provided the cocaine to be loaded on it.

Because the M/V Charmer is a Togo-flagged vessel, it is subject to U.S. jurisdiction if the

foreign flagged nation (Togo) consents or waives objection to the enforcement of U.S. law by the

United States.  46 U.S.C. § 70502(c)(1)(C).  In the instant case, in response to the Government's

official request, the Republic of Togo waived objection to the enforcement of United States law

by the United States.  To confirm this, the United States Department of State issued an official

certification of the Republic of Togo's action.[28]   This constitutes conclusive proof that the vessel

is subject to U.S. jurisdiction.[29]   United States v. Betancourt, 554 F.3d 1329, 1334 (11th Cir.

2009)(U.S. State Department certification that Ecuador had waived objection to enforcement of

U.S. law with regard to Colombian national onboard an Ecuadorian vessel was conclusive of

jurisdiction); United States v. Angulo-Hernandez, 565 F.3d 2, 11-12 (1st Cir. 2009)(U.S. State

Department certification was conclusive that Bolivia had consented to the enforcement of U.S.

law with regard to Bolivian flagged vessel); United States v. Vilches-Navarrete, 523 F.3d 1, 11

(1st Cir. 2008)(Torruela, J., Concurring)(regarding Honduran-flagged vessel *Babouth* that was

encountered in international waters, "[t]he Government presented the district court with

documentation containing the Seal of the United States Department of State which stated that the

Government of Honduras had granted the United States permission to enforce U.S. law against

the *Babouth*, its cargo, and the people on board").   Thus, because Togo waived its objection to

the enforcement of U.S. law by the United States, the M/V Charmer is subject to U.S.

jurisdiction pursuant to 46 U.S.C. § 70502(c)(1)(C).

      As an additional basis of asserting jurisdiction over the M/V Charmer, on two occasions

during the course of the conspiracy, the M/V Charmer was physically located within the

territorial waters of Honduras and, thus, was a vessel "in the territorial waters of a foreign

---

[28]     See Exhibit 25 (U.S. Department of State Certification of Togo's waiver of objection).

[29]     It is of no consequence that the U.S. Department of State certifications were obtained after the events involving at the M/V Charmer had concluded.   The Government may obtain the certifications any time prior to trial.   See United States v. Greer, 285 F.3d 158, 175-76 (2d Cir. 2000)(collecting cases)(finding that certifications may be obtained "any time before trial" in case where conspiracy concluded in 1991, and consent of foreign government was not obtained until after superseding indictment was returned in 1996).

nation." See 46 U.S.C. § 70502(c)(1)(E).   On March 8, 2009, the M/V Charmer was inspected by "Kenneth" at the direction of ANDRADE while in Honduran waters, and subsequently, in early May 2009, it entered Honduran waters when ANDRADE believed the cocaine was onboard.

The United States requested that Honduras consent to the enforcement of U.S. law by the United States with regard to the M/V Charmer, and Honduras subsequently provided its consent. The U.S. Department of State executed a certification of Honduran consent, and such is conclusive of MDLEA jurisdiction.[30]  46 U.S.C. § 70502(c)(2)(B);  Betancourt, supra, 554 F.3d at 1334 (11th Cir. 2009); United States v. Greer, 285 F.3d 158, 174-76 (2d Cir. 2000)(MDLEA jurisdiction based on vessels in Canadian waters).

To the extent ANTURI claims that his lack of contact with the M/V Charmer or the cocaine obviates any jurisdiction of the vessel against him, he would be incorrect.  The plain language of the MDLEA does not require that ANTURI (or his co-defendants) or the cocaine physically make contact with the M/V Charmer.  In a conspiracy, it is the agreement to commit an illegal act (in this case, distribution of a controlled substance on board a vessel subject to U.S. jurisdiction) that is the gravamen of the offense.  The fact that ANTURI did not climb aboard the M/V Charmer, and the cocaine was intercepted before it was loaded onto the M/V Charmer, does not affect culpability for the conspiracy offense.  See United States v. Salcedo-Ibarra, No. 8:07-49, 2009 WL1953399 (MDFL July 6, 2007)(Rejecting defendant's argument that MDLEA

---

[30]     See Exhibit 26 (U.S. Dept of State Certification regarding Honduran consent to U.S. jurisdiction).

17

conspiracy count should be dismissed because defendant was not onboard vessel).[31]

Although not required under the MDLEA, one of the co-conspirators in the instant case, ANDRADE's assistant, "Kenneth," did board the M/V Charmer to inspect it on March 8, 2009. Regardless, MDLEA jurisdiction is still appropriate over the M/V Charmer irrespective of whether ANTURI or any other named defendant was in physical contact with the vessel or the cocaine was loaded on board the vessel.

C.    MDLEA Jurisdiction Over the Go-Fast Vessels

The December 1, 2, and 12, 2008, go-fast vessels are also subject to U.S. jurisdiction under the MDLEA. As already set forth in detail previously, the MONTANO-VALENCIA DTO conspired to distribute cocaine and did load cocaine on board these go-fast vessels. The vessels departed the Pacific Coast of Colombia and traveled through international waters towards Costa Rica. These vessels were "vessels without nationality," commonly referred to as "stateless vessels," subject to the jurisdiction of the United States under the MDLEA because they traveled through international waters without any flag and contained no registration documents. In addition, with regard to the December 2, 2008, and December 12, 2008, go fast vessels, the go fast crew failed to claim any nationality, and, in fact, sought to avoid national identification by

---

[31]     In United States v. Greer, 285 F.3d 158, 174 (2d Cir. 2000), the Court upheld the MDLEA conviction of defendants who were charged with, from 1989 to 1991, conspiring to distribute and to possess with intent to distribute hashish on board a vessel subject to U.S. jurisdiction, but the decision did not clearly state whether the defendants actually boarded the vessels. In that case, in 1989, the defendants orchestrated and participated in off-loading large amounts of hashish from a vessel in the St. Lawrence River, presumably in Canadian waters. However, it was unclear whether the defendants actually set foot on the vessel. In addition, in 1990, the defendants planned another such load, but it never arrived, and in 1991, they again attempted to offload a shipment but the attempt failed and barrels of hashish were discovered floating in the St. Lawrence River. MDLEA jurisdiction was based on Canada granting jurisdiction because one or more of the vessels had been located in Canadian territorial waters.

actively evading law enforcement.

     1.     <u>December 1, 2008 Vessel</u>

As noted previously, this go-fast vessel was connected to the MONTANO-VALENCIA DTO, traveled through international waters, and attempted to evade Costa Rican law enforcement in the morning hours of December 1, 2008, before being abandoned on the beach near Puntarenas, Costa Rica, with 2,600 grams of cocaine on board.

From the time it traveled through international waters through the time of interception, the vessel was stateless.  It failed to display its flag of nationality and had no registration documents.   Additionally, the obliteration of the registration number on the vessel was an attempt to hide any registration and avoid national identification.  <u>Matos-Luchi</u>, 627 F.3d at 6 (vessels that fail to display their insignia of nationality and "seek to avoid national identification" are stateless).  All of these factors establish that the go-fast vessel was without nationality.[32]

     2.     <u>The December 2, 2008 and December 12, 2008 Go Fast Vessels</u>

Similarly, the go-fast vessels which were encountered on December 2, 2008, and December 12, 2008, in international waters by U.S. Coast Guard officers, were also stateless vessels subject to U.S. jurisdiction.   At the time the go-fast vessels were confronted by law enforcement, neither displayed a national flag, possessed any papers reflecting their nationality, nor stopped so that law enforcement could identify the vessels or the individuals on them in order

---

[32]     Additionally, the facts surrounding the go-fast vessel are consistent with the smuggling tactics set forth in the MDLEA forfeiture section that describes "prima facie evidence of [an MDLEA] violation."  46 U.S.C. § 70507.  The go-fast vessel had overpowered engines, <u>see</u> 46 U.S.C. §70507(b)(1)(D), excessive fuel tanks, <u>see</u> 46 U.S.C. §70507(b)(3), and failed to stop and made evasive maneuvers when pursued by law enforcement.  <u>See</u> 46 U.S.C. § 70503(b)(5).  In short, the vessel could have been seized and forfeited for being used in violation of the MDLEA, and such violation consisted in this case of distributing a controlled substance on board a stateless vessel.

to obtain registry information.

When law enforcement approached, both go-fast vessels took evasive action to avoid making any affirmative claim of nationality.  Rather than heave to for inspection and boarding, both go-fast vessels accelerated at a rapid speed, dumped multiple bales of cocaine overboard, and escaped to Panamanian and Colombian territorial waters, respectively.  By doing so, the vessels deprived the U.S. Coast Guard of the opportunity to confront the go fast crew and conduct an appropriate boarding colloquy to determine the nationality of the vessels.

Moreover, the go-fast vessels and crew evaded capture and identification by law enforcement.   By fleeing, the go-fast crews indicated that they were not prepared to make any claim of nationality and confirmed the U.S. Coast Guard officers' recognition of the vessels as classic stateless drug transportation vehicles.  Thus, under the MDLEA and prevailing case law, these go-fast vessels were stateless as well.  As a result, they were subject to the jurisdiction of the United States.

## CONCLUSION

For the foregoing reasons and based upon the arguments and exhibits in the instant motion, the United States asks the Court to issue a pretrial order finding that the M/V Charmer and the go-fast vessels from which cocaine was seized on December 1, 2008, December 2, 2008, and December 12, 2008, were subject to the jurisdiction of the United States under the MDLEA.

Respectfully submitted,

ARTHUR WYATT, Chief
U.S. Department of Justice
Criminal Division
Narcotic and Dangerous Drug Section

By:   _____/s/_____

Stephen Sola
Mark Maldonado
Stephen M. May
Trial Attorneys
U.S. Department of Justice
Criminal Division
Narcotic and Dangerous Drug Section
1400 New York Avenue, NW
Washington, DC 20530
Main Office: (202) 514-0917
Fax: (202) 514-0483
Stephen.Sola@usdoj.gov
Mark.Maldonado2@usdoj.gov
Stephen.May@usdoj.gov

## EXHIBITS

Exhibit 1:        Excerpt of Costa Rican Drug Enforcement Police (PCD) report of seizure on December 1, 2008, (Five page excerpt of 79 page report), Spanish.

Exhibit 2:        Excerpt of Costa Rican Drug Enforcement Police (PCD) report of seizure on December 1, 2008, and inventory of the abandoned go-fast (Five page excerpt of 79 page report)(English Translation).

Exhibit 3:        Photo of Tweety and Tweety and Sylvester Logos from cocaine recovered from go fast in Costa Rica on December 1, 2008.

Exhibit 4:        Statement of Port Commander Jose Luis Paredes Araya, Costa Rican Ministry of Public Works & Transportation, Spanish.

Exhibit 5:        Statement of Port Commander Jose Luis Paredes Araya, Costa Rican Ministry of Public Works & Transportation (English Translation).

Exhibit 6:        Photo of obliterated registration number on the bow of go fast.

Exhibit 7:        Video Screenshot from video by Costa Rican law enforcement, showing Iridium Satellite Phone recovered from vessel.

Exhibit 8        Transcript of intercepted call, December 1, 2008, 4:36:36.

Exhibit 9        Transcript of intercepted call, November 30, 2008, 19:10:06.

Exhibit 10:        Statement of USCG Officer Ryan Patterson.

Exhibit 11:        Statement of USCT Officer Gregory Sickels.

Exhibit 12        Transcript of Intercepted Call, December 1, 2008, 22:13:35

Exhibit 13        Transcript of Intercepted Call, December 1, 2008, 23:42:24

Exhibit 14:        Photo of "Tweety" logo affixed to cocaine brick recovered by USCG crew onboard U.S.S. Samuel B. Roberts on December 2, 2008.

Exhibit 15:        Statement of USCG Officer Richard Sparks

Exhibit 16        Transcript of intercepted call, December 12, 2008, 21:14:08

Exhibit 17:        Statement of USCG Officer Kelvin Morgan

Exhibit 18:        Photo of "Tweety & Sylvester" logo on cocaine seized on December 12,

2008

| | |
|---|---|
| Exhibit 19: | Photo of M/V Charmer |
| Exhibit 20-21-22: | Registration (flag) of M/V Charmer |
| Exhibit 23: | Map with Location of M/V Charmer on March 8, 2009 |
| Exhibit 24 | Transcript of consensually recorded conversation between ANDRADE and DEA undercover officer, May 5, 2009 |
| Exhibit 25 | U.S. Department of State Certification from Togo |
| Exhibit 26 | U.S. Department of State Certification from Honduras |

**Certificate of Service**

I hereby certify that on this day of September, 2012, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of such filing (NEF) to the following individuals:

Robert Feitel, Esq.
Robert Spelke, Esq.
Sandy Rhee, Esq.

_____/s/_____
Mark Maldonado
Stephen Sola
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W., 8th Floor
Washington, D.C.  20530
Tel.:    (202) 514-8020
Email:  Stephen.Sola@usdoj.gov